**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LEAR AUTOMOTIVE DEARBORN, INC.
and LEAR CORPORATION,

       Plaintiffs,                             Case No. 04-73461
                                            Hon. Gerald E. Rosen

v.

JOHNSON CONTROLS, INC. and
JOHNSON CONTROLS INTERIORS LLC,

       Defendants.
_____/

**OPINION AND ORDER REGARDING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT REGARDING RODDY PATENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      November 2, 2007     

PRESENT: Honorable Gerald E. Rosen
                      United States District Judge

## I. **INTRODUCTION**

Plaintiffs Lear Automotive Dearborn, Inc. and Lear Corporation (collectively

"Lear") commenced this suit in this Court on September 7, 2004, alleging that the

"HomeLink" remote-control garage door opener product manufactured and sold by

Defendants Johnson Controls, Inc. and Johnson Controls Interiors LLC (collectively

"JCI") infringes several patents owned by Lear. JCI, in turn, has asserted counterclaims

of non-infringement and patent invalidity and/or unenforceability against Lear. This

Court's jurisdiction rests upon the parties' assertion of claims and counterclaims under the federal patent laws, 35 U.S.C. § 1 *et seq.* <u>See</u> 28 U.S.C. § 1338(a).

Through a pair of motions filed on February 1, 2006, JCI now seeks summary judgment in its favor as to (i) its non-infringement of one of the patents-in-suit, U.S. Patent No. 5,731,756 (the "Roddy patent"), as well as the invalidity and unenforceability of this patent, and (ii) its non-infringement of the remaining two patents-in-suit, U.S. Patent No. RE 36,181 and U.S. Patent No. RE 36,752 (collectively, the "Koopman patents"). In support of its claims of non-infringement, JCI contends that the patent claims asserted by Lear in this case, if properly construed, do not encompass the features found in JCI's HomeLink product. JCI further contends that the Roddy patent is anticipated by the prior art, and hence is invalid, and that this patent also is unenforceable by virtue of the alleged failure to disclose material prior art during patent prosecution.

These motions have been fully briefed by the parties, and the Court heard oral argument limited to the first of these motions on October 26, 2006.[1] Having reviewed the parties' written submissions and the record as a whole, and having considered the arguments of counsel at the October 26 hearing, the Court now is prepared to rule on JCI's motion regarding the Roddy patent. This Opinion and Order sets forth the Court's rulings on this motion.

---

[1] At the conclusion of this hearing, counsel requested that the Court hold its rulings in abeyance so that the parties could pursue settlement discussions. The Court has since been advised, however, that no settlement has been reached.

## II.  FACTUAL BACKGROUND

**A.      The Technology at Issue in This Case**

Although the specific patent claims and products involved in this suit are discussed in greater detail below, as pertinent to the particular issues raised by the parties, it is helpful at the outset to describe the general nature and contours of the technology at issue here.  In particular, this case concerns remote-control technology for opening garage doors, as well as for related purposes such as remote keyless entry into a vehicle.

In the past, garage door opener ("GDO") systems, as well as remote keyless entry ("RKE") systems for locking and unlocking vehicle doors, used so-called "fixed code" technology, meaning that a transmitter always sent precisely the same radio frequency ("RF") signal to a receiver that was hard-wired to recognize only this signal and perform the appropriate function (*e.g.,* open a garage door).  Among the various limitations of these systems, their use of fixed-code technology enabled their signals to be intercepted by thieves and re-transmitted to gain access to the owner's garage or vehicle.

By the early 1990s, several companies developed technology for encrypting the signals sent from the transmitter to the receiver in GDO and RKE systems.  Encryption is a process of translating a message (often referred to as the "plaintext") into an encoded message (the "ciphertext") so as to disguise its contents from would-be interceptors.  Decryption, in contrast, is a process through which ciphertext is translated back into plaintext.

The fixed-code systems of the past did not use encryption or decryption, but

simply transmitted the same unencrypted signal time after time. The incorporation of encryption improved the security of RKE and GDO systems to some extent, but still left them vulnerable to interception and re-transmission of their encrypted signals. Eventually, however, manufacturers of RKE and GDO systems began to develop sophisticated methods of encryption that did not simply transmit the ***same*** encrypted signal time after time, but rather generated a ***different*** encrypted signal each time the user pushed the button on the transmitter. This technology, whereby the transmitter and receiver are able to generate and authenticate, respectively, a different encrypted signal for each successive push of a button, typically is referred to as "rolling-code" or "code-hopping" encryption.

**B.     The General Nature of the Patents-in-Suit**

In this case, Plaintiffs Lear Automotive Dearborn, Inc. and Lear Corporation (collectively "Lear") allege that Defendants Johnson Controls, Inc. and Johnson Controls Interiors LLC (collectively "JCI") have infringed three patents owned by Lear. These three patents, broadly speaking, fall within two discrete categories of technology used in GDO and RKE systems.

The first patent-in-suit is U.S. Patent No. 5,731,756 (the "Roddy patent"), which was issued to inventor Timothy Roddy on March 24, 1998, and assigned to his employer (and Lear's predecessor-in-interest), United Technologies Automotive, Inc. The claims of this patent describe, as a general matter, methods for allowing a user to remotely actuate various systems in and around a home, including garage door openers, home

security systems, and lights, by means of a universal control device that incorporates rolling-code encryption technology.

The remaining two patents-in-suit are U.S. Patent No. RE 36,181 and U.S. Patent No. RE 36,752 ( the '181 and '752 patents or, collectively, the "Koopman patents"), which again were assigned to Lear's predecessor-in-interest, United Technologies Automotive.  These two patents, generally speaking, disclose methods of cryptographically encoding and authenticating RF signals sent from transmitters to receivers in RKE systems.  These inventions, according to Lear, significantly improved the security of the remote control systems that incorporated them, making it far more difficult to breach these systems.  These patents — or, at a minimum, the claims at issue in this case — utilize a "rolling-code" encryption methodology.  In addition, the '752 patent addresses the need to ensure that the key "fob" in a RKE system remains synchronized with the receiver unit mounted in the automobile, even when, for example, the vehicle owner presses a button on the fob when it is beyond the range of the car.

C.     JCI's "HomeLink" Remote-Control Garage Door Opener

Beginning in the early 1990s, a predecessor-in-interest of JCI, the Prince Corporation, developed the "HomeLink" system that Lear accuses of infringement in this case.  HomeLink features a remote-control transmitter that typically is built into a vehicle's overhead console, mirror, or visor, allowing the vehicle owner to press a button and transmit a RF signal to a receiver that responds by opening or closing a garage door.  According to JCI, the principal advantage of its HomeLink system is that it can be trained

5

to activate virtually any GDO on the market, regardless of manufacturer.  The system typically includes multiple buttons, permitting a single built-in transmitter to communicate with several GDOs (or other systems).

### III.  ANALYSIS

**A.    The Standards Governing JCI's Motion**

Through the motion presently under consideration, JCI seeks summary judgment in its favor as to the issues of (i) non-infringement of the Roddy patent, and (ii) invalidity and/or unenforceability of this patent.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment.  These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.  As stated in Celotex:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex, 477 U.S. at 322.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989); see also Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994). The Court will apply the above standards in resolving JCI's motion for summary judgment regarding the Roddy patent.

**B.     JCI's HomeLink Product Does Not Literally Infringe the Roddy Patent, But Issues of Fact Remain as to Infringement Under the Doctrine of Equivalents.**

As the first issue raised in its motion, JCI argues that its HomeLink product does not infringe the Roddy patent, whether literally or under the doctrine of equivalents. In support of this contention, JCI asserts that the claims of the Roddy patent, properly construed, require a receiver that operates by performing *encryption.* JCI's HomeLink

product, in contrast, operates by performing ***decryption.*** In light of this distinction, JCI

argues that its product cannot infringe the Roddy patent. While the Court agrees with

JCI's proposed construction of the Roddy patent, it nonetheless concludes that the record

does not foreclose the possibility that the HomeLink product infringes this patent under

the doctrine of equivalents.

### 1. The Law Governing the Court's Infringement Inquiry

This Court's infringement inquiry is governed by a two-step analytical framework.

See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1315

(Fed. Cir. 1998); Kahn v. General Motors Corp., 135 F.3d 1472, 1476 (Fed. Cir. 1998).

First, the pertinent claims must be construed to determine their meaning and scope. See

Ethicon, 149 F.3d at 1315. Next, the claims as construed must be compared to the

accused device or system. Ethicon, 149 F.3d at 1315. To establish literal infringement,

the plaintiff must demonstrate by a preponderance of the evidence "that every limitation

in the claim is literally met by the accused device." Kahn, 135 F.3d at 1476.

Alternatively, under the doctrine of equivalents, the plaintiff may establish infringement

by demonstrating that "there is 'equivalence' between the elements of the accused

product or process and the claimed elements of the patented invention." Kahn, 135 F.3d

at 1478 (internal quotation marks and citations omitted).

The first step of this inquiry, the construction of patent claims, is "exclusively

within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370,

372, 116 S. Ct. 1384, 1387 (1996). The principal focus of claim construction is the words

of the claims themselves, as "the claims are of primary importance, in the effort to ascertain precisely what it is that is patented."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks and citation omitted).  "[T]he words of a claim are generally given their ordinary and customary meaning" — that is, "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1312-13 (internal quotation marks and citations omitted).

The patent claims "do not stand alone," however, but "are part of a fully integrated written instrument" that also includes a specification.  415 F.3d at 1315 (internal quotation marks and citation omitted).  Thus, "claims must be read in view of the specification, of which they are a part," and the specification is "the single best guide to the meaning of a disputed term."  415 F.3d at 1315 (internal quotation marks and citation omitted).  Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  415 F.3d at 1313. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  415 F.3d at 1316 (internal quotation marks and citation omitted).

Beyond the four corners of the written instrument, the Court also may consider "intrinsic evidence" — consisting of "the complete record of the proceedings before" the Patent and Trademark Office ("PTO"), including "the prior art cited during the

examination of the patent" — and "extrinsic evidence" — which includes "expert and inventor testimony, dictionaries, and learned treatises." 415 F.3d at 1317 (internal quotation marks and citations omitted). Yet, the intrinsic evidence "is less useful for claim construction purposes" than the claim language itself, and the extrinsic evidence is still "less significant than the intrinsic record in determining the legally operative meaning of claim language." 415 F.3d at 1317 (internal quotation marks and citations omitted). With these standards in mind, the Court turns to the task of construing the Roddy patent.

**2.      Claim 1 of the Roddy Patent Requires a Receiver That Performs Encryption.**

As noted, JCI's challenge to Lear's claim of patent infringement rests solely upon the premise that the Roddy patent requires a receiver that operates by performing encryption. If this is so, it readily follows, in JCI's view, that its HomeLink system cannot literally infringe the Roddy patent, as it is uncontested that the receiver in JCI's system performs *decryption* rather than *encryption.* This question of "encryption versus decryption," then, is the only issue of claim construction that the Court must address at the present juncture with respect to the Roddy patent.

The Court's inquiry on this point necessarily begins with the language of the patent claims themselves. Although Lear has asserted claims 4 through 7 of this patent,[2] the parties agree that the relevant language appears in claim 1, upon which claims 4

---

[2]Lear states that it initially asserted claim 8 as well, but withdrew it following discovery.

through 7 are dependent.  This claim provides in full:

> 1.  A method of actuating at least one home security system remotely comprising the steps of:
>
>> (1)  providing a transmitter with encryption logic to send an encrypted signal, providing a receiver adapted to identify an expected encrypted signal, said receiver being adapted to actuate a home security system said encryption logic sending signals that change sequentially, and thus are different on each actuation of said transmitter, said changing sequentially different signals being predictable to said receiver;
>>
>> (2)  sending an encrypted signal from said transmitter;
>>
>> (3)  receiving said signal at said receiver, and comparing said received signal to an expected signal; and
>>
>> (4)  actuating said system if said received signal is determined to be as expected in step 3.

(JCI's Motion, Ex. 1, Roddy Patent at 6:8-22.)

There is no question, and Lear readily acknowledges, that the transmitter described in this claim uses "encryption logic" to send "encrypted signal[s]."  It is also clear, and Lear again agrees, that the receiver "receiv[es]" these encrypted signals, and necessarily must somehow "compar[e]" these "received signal[s]" to "expected signal[s]" in order to determine whether to actuate the relevant home security system at step 4 of the claim.  The parties' dispute, then, focuses upon the nature of the "compar[ison]" referred to at step 3 of the claim.  JCI argues that the receiver must perform encryption in order to generate the "expected signal" that it will compare to the received (encrypted) signal.  Lear, on the other hand, contends that the requisite comparison can be achieved by

decrypting the received (encrypted) signal and **then** comparing the result to an **unencrypted** "expected signal."

The Court finds that JCI has the better of the argument, for a number of reasons. First and foremost, if the "expected signal" referred to at step 3 could encompass either encrypted or unencrypted signals, as Lear contends, then such a construction seemingly would conflict with the reference at step 1 to a "receiver adapted to identify an expected **encrypted** signal."[3]  Although this "expected encrypted signal" language is not repeated verbatim at step 3, but instead is shortened to "expected signal," the "receiver" referred to in the latter step plainly is the very same "receiver" whose general function is set forth at step 1 — namely, a device "adapted to identify an expected encrypted signal."  In this context, the Court finds that the "expected signal[s]" referenced in steps 1 and 3 are properly construed as one and the same — *i.e.,* as **encrypted** signals.

In addition, the Court believes that this construction better comports with the ordinary meaning of the word "compar[e]."  Plainly, this activity requires that the items in question must be susceptible of comparison — *e.g.,* converted into the same unit of measure.  Lear's expert, Dr. Avi Rubin, acknowledged as much at his deposition, opining that there were three ways in which a receiver could perform the comparison referred to at claim 1, step 3 of the Roddy patent:  (i) by "decrypt[ing] the transmission and compar[ing] it to an expected plain text value," (ii) by "tak[ing] the [expected] plain text

---

[3]In its recitation of the pertinent claim language in its response to JCI's motion, Lear notably omits this passage from step 1 of the claim.  (<u>See</u> Lear's Response Br. at 3.)

value and encrypt[ing] it and compar[ing] it to what it received," or (iii) by "perform[ing] some operation that . . . performs partial encryption and then partial decryption and compar[ing] for some value in the middle." (Lear's Response, Ex. D, Rubin Dep. at 103-04.) Under this testimony, then, "comparison" is done only *after* the two values in question are made comparable, through some combination of encryption and decryption that the receiver performs on either the signal sent by the transmitter, a plaintext expected value, or both.

Yet, step 3 does not refer to any intermediate processing, calculation, or transformation of any sort that the receiver performs *between* receipt of the transmitted signal and comparison to an expected signal; rather, it states merely that the signal is received and then compared. This immediate juxtaposition of actions requires that the received and expected signals *already* be capable of comparison — *i.e.,* that both signals are encrypted. This reading of step 3 also comports with the above-cited language from step 1, providing that the receiver is "adapted to identify an expected *encrypted* signal." This specified adaptation, of course, obviates the need for the receiver to *decrypt* a received signal before comparing it to an expected value. Thus, while Dr. Rubin's testimony fairly characterizes the range of possible ways that a receiver could determine whether a received signal matches an expected value, the Court views the language of claim 1, read as a whole, as limiting the specified receiver to only one of these three means — namely, a comparison between encrypted signals.

Still other portions of the language of claim 1 lend further support to this

13

conclusion.  Step 1 stipulates that the transmitter is provided with "encryption logic" that enables it to "send[] signals that change sequentially, and thus are different on each actuation of said transmitter."  This step then provides that these "changing sequentially different signals [are] predictable to said receiver."  Similarly, after performing the receipt and comparison required under step 3, the receiver proceeds at step 4 to "actuat[e] said system if said received signal is determined to be as expected."  These various passages, read together, indicate that the receiver must be able to "predict[]" the sequentially changing — and encrypted — signals sent by the transmitter and actuate the proper home security system upon receipt of an "expected" signal.  Presumably, in order to "predict" the "expected signal[s]" that will emerge from a transmitter that is performing encryption, the receiver must be able to mimic the transmitter's operation — *i.e.,* it must also perform encryption.

Finally, the Court finds that the specification is fully consistent with and supportive of JCI's proposed construction of claim 1.  At one point, for example, the specification states that "when the receiver receives a signal from the transmitter, it compares the received signal to the first expected signal to determine whether the newly received signal is an acceptable signal."  (Roddy Patent at 4:41-44.)  As with the language of the claim itself, this passage from the specification indicates that the receiver makes a direct comparison between a received (encrypted) signal and an expected signal — a comparison which, as explained, is only possible if both signals are encrypted.  Similarly, the specification later refers to the possible modification of an existing GDO by adding an

14

"encrypted receiver unit" that is able to "recognize[] . . . encrypted signals." (Id. at 5:36-39.)

The receiver's evident ability to perform encryption is made explicit in another portion of the specification. In particular, the specification describes a "particular preferred embodiment" in which "the receiver and transmitter are both provided with encryption logic that sequences through a great number of different encrypted signals." (Id. at 4:27-29.) As explained in the specification, this use of the same logic enables both the transmitter and receiver to "know[] the sequential encrypted signals," such that "the receiver is able to predict and recognize the encrypted signal" sent by the transmitter. (Id. at 4:10-14.) Presumably, if the receiver both "knows" and is "able to predict and recognize" the sequence of encrypted signals that the transmitter will send, it must be carrying out encryption operations in parallel with those performed by the transmitter.

Lear's arguments against this interpretation of claim 1 are not persuasive. First, Lear notes the absence of language at step 3 explicitly stating that the receiver performs an encryption operation in order to generate an expected encrypted signal that can be compared to the received signal. Yet, the Court has already explained why, in its view, it is most natural to read the "expected signal" at step 3 *in para materia* with the "expected *encrypted* signal" referenced in step 1. This being the case, it necessarily follows, whether step 3 expressly says so or not, that the receiver must perform an encryption operation in order to form an expected encrypted signal that may be compared to a received encrypted signal. Thus, the Court cannot accept Lear's contention that JCI's

proposed construction would impermissibly insert a limitation that is not found in the claim language itself. Rather, the claim stipulates, at step 1, that the receiver is "adapted to identify an expected encrypted signal," thereby enabling the receiver to compare two encrypted signals (received and expected) at step 3.

Lear next points to certain portions of the specification as purportedly inconsistent with JCI's proposed construction. First, Lear cites the specification's reference to certain "[p]referred patented encryption technology [that] is available from United Technologies Automotive, Inc. of Dearborn, Mich." (Id. at 4:4-6.) While this preferred technology is not identified in the specification itself, inventor Timothy Roddy testified that the intended reference was to the technology disclosed in the Koopman patents that also are at issue here. (See Lear's Response, Ex. E, Roddy Dep. at 68-69.) Lear then notes that the specification for one of these patents, the '181 patent, refers to a receiver performing "decryption." (Lear's Response, Ex. F, '181 Patent at 4:27.) Juxtaposing all of this, Lear contends that JCI's proposed interpretation would take the preferred embodiment outside the scope of the Roddy patent, a construction which the case law recognizes "is rarely, if ever, correct." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

This contention fails to persuade, on a number of levels. First, JCI correctly notes the patent law principle that "[t]o incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates." Advanced Display Systems, Inc. v. Kent State University, 212 F.3d 1272, 1282 (Fed. Cir.

2000).  The Roddy patent manifestly fails to meet this standard through its reference to unspecified "patented encryption technology . . . available from United Technologies."  Indeed, JCI points to at least two other patents, apart from the Koopman patents, that would meet this description.

In any event, any suggestion of decryption that could be culled from the Roddy patent's reference to unspecified "patented encryption technology" is overcome by the language that immediately follows this reference.  Specifically, in describing this "patented encryption technology" and its use in the preferred embodiment of the invention, the specification states that this technology calls for a transmitter and receiver alike to be "provided with logic that 'knows' the sequential encrypted signals," so that both "will know what encryption will be performed" upon each actuation of the system, and so that the receiver, in particular, will be "able to predict and recognize the encrypted signal" sent by the transmitter.  (Roddy Patent at 4:8-14.)  As discussed earlier, the Court reads this language as indicative of a receiver that performs encryption.

Lear next points to patent figure 3, a flow chart of the invention.  This figure identifies the successive stages of the patented method as (i) send signal, (ii) encrypt, (iii) transmit, (iv) receive, and (v) compare acceptable.  Lear reads this figure as dictating encryption by the transmitter, but as silent regarding the receiver's use of encryption, decryption, or some combination thereof in performing its comparison.  Yet, as discussed earlier, any silence on this issue in figure 3, like the analogous silence in claim 1, step 3 as to the precise nature of the "compari[son]" to be performed, is overcome by language

elsewhere in claim 1 and the specification that reflects a comparison between encrypted signals. Thus, even if the figure is deliberately open-ended in this regard, other portions of the patent — most significantly, the language of claim 1 itself — limit the operation of the receiver to encryption rather than decryption.

Finally, Lear points to the above-quoted testimony of its expert, Dr. Rubin, regarding the number of different ways that a receiver could determine whether a received signal matches an expected value. As previously explained, however, this catalog of possibilities is narrowed by the language in claim 1, step 1, which describes the receiver as capable of identifying an expected "encrypted" signal. In addition, Dr. Rubin himself apparently draws a distinction between "comparison" and the encryption or decryption necessary to enable such a comparison. As observed above, claim 1, step 3 evidently contemplates that no such intervening operation need be performed between the receipt of a signal and the comparison of received and expected signals, and this could only be so if the expected signal, like the received one, is encrypted. Accordingly, this expert testimony — which, as extrinsic evidence, plays a lesser role in the Court's claim construction effort, see Phillips, 415 F.3d at 1317 — does not overcome the language in claim 1 itself. This language, in the Court's view, mandates a receiver that performs encryption in order to compare received and expected signals.

**3.      Because the HomeLink Receiver Performs Decryption Rather Than Encryption, JCI's Product Does Not Literally Infringe the Roddy Patent.**

Having settled upon a construction of the disputed terms of claim 1 of the Roddy

patent, the Court now proceeds to the second step of its infringement analysis — namely, a comparison between the claim as construed and the accused HomeLink system. This comparison readily reveals the absence of literal infringement of the Roddy patent.

JCI asserts, and Lear does not contest, that the receiver in the HomeLink system does not perform encryption in order to determine whether to activate a GDO. Instead, the receiver *decrypts* the signal received from the HomeLink transmitter before comparing to an expected value and determining whether the GDO should be activated. Because the HomeLink system lacks a limitation found in claim 1 as construed by the Court, JCI's product does not literally infringe this claim. Moreover, because the claims asserted by Lear, claims 4 through 7, all depend from claim 1, these claims likewise are not literally infringed by the HomeLink system.

### 4.    Issues of Fact Preclude a Determination as a Matter of Law Regarding Infringement Under the Doctrine of Equivalents.

Notwithstanding the Court's award of summary judgment in JCI's favor on the issue of literal infringement, there remains the possibility that the HomeLink system might be found to infringe the Roddy patent under the doctrine of equivalents. "Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 21, 117 S. Ct. 1040, 1045 (1997). While "[i]nfringement under the doctrine of equivalents is a

question of fact," <u>Kraft Foods, Inc. v. International Trading Co.</u>, 203 F.3d 1362, 1371 (Fed. Cir. 2000), JCI advances a number of reasons why, in its view, the doctrine is unavailable here as a matter of law. As discussed below, the Court is not persuaded that this question should be taken away from the trier of fact.

As a threshold issue, JCI contends that Lear is barred from pursuing a claim of infringement under the doctrine of equivalents by virtue of the failure of its expert, Dr. Rubin, to offer an opinion on this subject in his expert report. <u>See</u> <u>PC Connector Solutions LLC v. SmartDisk Corp.</u>, 406 F.3d 1359, 1364 (Fed. Cir. 2005). Yet, JCI concedes that it had an opportunity to explore this matter when Dr. Rubin raised it at his deposition. Moreover, Lear correctly observes that any lack of a formal opinion by Dr. Rubin is overcome by JCI's acknowledged familiarity with and awareness of the evidence that bears upon the equivalence inquiry — an awareness that is amply illustrated in JCI's ability to formulate a number of arguments as to why the doctrine of equivalents should not apply here. Accordingly, any failure by Dr. Rubin to address this doctrine in his expert report is harmless, and hence does not warrant the exclusion of his testimony on this subject, whether at trial, <u>see</u> Fed. R. Civ. P. 37(c)(1), or for purposes of deciding the present motion.

Turning to the substance of the equivalence inquiry, the courts have explained that "[i]nfringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially." <u>Ethicon</u>, 149 F.3d

at 1315.  Here, in the event that the Court were to hold, as it now has done, that JCI's HomeLink system does not literally infringe claim 1 of the Roddy patent because the HomeLink receiver does not perform encryption, Lear nonetheless contends that the decryption technique employed by JCI's receiver is clearly equivalent to, and differs insubstantially from, the encryption methodology disclosed in the Roddy patent.  In support of this contention, Lear points to the above-cited testimony of its expert, Dr. Rubin, that there are three different ways, well known to those in the art during the relevant time period, that a receiver can determine whether a received encrypted signal matches an expected value.  (See Lear's Response, Ex. D, Rubin Dep. at 103-05.)

As its first challenge to this claim of infringement under the doctrine of equivalents, JCI argues that the application of the doctrine here would run afoul of the so-called "all elements" rule.  Under this principle, the doctrine may not be applied at such a broad level of generality that it effectively dispenses with one or more of the individual elements of a claim, and instead calls only for consideration whether the patented and accused products evidence an "overall" equivalence.  See Warner-Jenkinson, 520 U.S. at 29-30, 117 S. Ct. at 1049; Ethicon, 149 F.3d at 1316.  As discussed earlier, the receiver in JCI's HomeLink system lacks the capability to perform encryption in order to compare received and expected signals.  In light of this absence of an element of claim 1 of the Roddy patent, JCI submits that the doctrine of equivalents cannot be applied to bridge this gap and find infringement.

This argument misconstrues the holding in Warner-Jenkinson.  While the Supreme

Court in that case expressed its disapproval of the application of the doctrine of equivalents whenever two devices or processes are found to be equivalent "overall," its focus on individual elements of a claim is entirely consistent with Lear's appeal to the doctrine here. Lear does not contend that the method disclosed in claim 1 of the Roddy patent and the method used by JCI's HomeLink product are equivalent "overall." Rather, it asserts, through the testimony of its expert, that one specific limitation of this claim — namely, that the receiver compares a received (encrypted) signal to an expected signal — has a corresponding and insignificantly different equivalent in the HomeLink system — namely, that the receiver in JCI's product first decrypts the received signal before comparing the result to an expected value. To maintain, as JCI does, that this claimed equivalence as to a particular element of claim 1 violates the "all elements" rule would "swallow the doctrine of equivalents, reducing the application of the doctrine to nothing more than a repeated analysis of literal infringement." Ethicon, 149 F.3d at 1317.

Similarly, the Court cannot accept JCI's suggestion that the application of the doctrine here would result in a limitation (encryption) covering its "opposite" (decryption). As is evident from Dr. Rubin's deposition testimony, the three above-cited techniques of translation and comparison are not **opposites,** but merely **different** ways of accomplishing the same task of authenticating a received signal.[4]

_____

[4]Because the testimony of Lear's expert would permit the conclusion that the distinction between encryption and decryption amounts to only a "small variation" in the means by which claim 1 of the Roddy patent and JCI's product "achiev[e] a claimed limitation," as opposed to wholly "opposite" means of accomplishing the same overall task, the case cited by JCI in a supplemental brief after oral argument, Planet Bingo, LLC v. Gametech International, Inc., 472

JCI next suggests that Roddy's failure to include the "foreseeable alternative" of decryption within the scope of his patent precludes him from seeking to "renegotiate" the boundaries of his patent at this late date through the vehicle of the doctrine of equivalents. As Lear correctly observes, however, "known interchangeability" is one of the factors that courts properly may consider in determining "whether the accused device is substantially the same as the patented invention." Warner-Jenkinson, 520 U.S. at 36, 117 S. Ct. at 1052. If a patentee were compelled to include any and all "foreseeable alternatives" to each claim element in order to pursue a claim of infringement under the doctrine of equivalents, it is difficult to see how any known substitutes would remain available to trigger the application of the doctrine. By preserving his eligibility to appeal to the doctrine, a patentee would effectively eviscerate the doctrine itself. See Litton Systems, Inc. v. Honeywell, Inc., 140 F.3d 1449, 1464-65 (Fed. Cir. 1998) (rejecting a similar attempt to restrict the doctrine of equivalents to "only after-arising equivalents"). The Court does not read the case cited by JCI, Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1425 (Fed. Cir. 1997), as compelling such a result. Rather, this decision, which draws a distinction between "foreseeable variations" of a "claim element" and an overall "patent claim," Sage Products, 126 F.3d at 1425, is readily reconcilable with Warner-Jenkinson on this point.

Finally, JCI contends that a narrowing amendment made during the course of the

_____

F.3d 1338, 1344-45 (Fed. Cir. 2006), does not alter the Court's conclusion on this point.

prosecution of the Roddy patent defeats Lear's purported effort to claim infringement as to the subject matter surrendered through this amendment. In particular, JCI cites the amendment of claim 1 during prosecution to add the language at step 1 requiring that "said changing sequentially different signals be[] predictable to said receiver." Since this ability to "predict," in JCI's view, mandates a receiver that encrypts, JCI argues that it would be improper to allow Lear to recapture surrendered subject matter — namely, a receiver that *decrypts* — through the application of the doctrine of equivalents.

As discussed earlier, the Court agrees that the Roddy patent's reference to "predict[ion]" is suggestive of a receiver that encrypts. Yet, the Court merely cited this consideration as one among many leading to the conclusion that claim 1 includes this limitation. Standing alone, however, the capacity to "predict" does not necessarily dictate the use of encryption versus decryption. Rather, the term "predictable" at the end of step 1 plainly is meant, first and foremost, to distinguish between fixed-code and rolling-code technology, with the latter requiring that the receiver stay synchronized with the transmitter so that it can anticipate and authenticate continually changing signals. As Lear points out, and as Dr. Rubin effectively testified, this sort of "prediction" can be accomplished either by (i) generating an encrypted expected signal and comparing to a received signal, or (ii) decrypting the received signal and then comparing to an expected plaintext value. Thus, the Court cannot conclude as a matter of law that Mr. Roddy surrendered the subject matter of decryption by adding "prediction" language to claim 1 during the course of patent prosecution. Rather, this amendment was at most "tangential"

24

to the equivalence that forms the basis for Lear's appeal to the doctrine of equivalents. See Glaxo Wellcome, Inc. v. Impax Laboratories, Inc., 356 F.3d 1348, 1352 (Fed. Cir. 2004); see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 738, 122 S. Ct. 1831, 1841 (2002) (explaining that a narrowing amendment does not "foreclose claims of equivalence for aspects of the invention that have only a peripheral relation to the reason the amendment was submitted").

At oral argument, however, JCI's counsel insisted at length that the HomeLink receiver does not perform any sort of function that could be characterized as "prediction." Instead, JCI asserts that its receiver decrypts an incoming signal and then subtracts a "counter value" stored in its internal memory from the decrypted plaintext value, opening the garage door if the result is within an acceptable range.[5] Yet, stripping away the more anthropomorphizing aspects of the notion of "predicting" an "expected" signal, the Court believes that the operation of the HomeLink receiver as described by JCI's counsel fits comfortably within one of the interchangeable variations identified by Lear's expert — namely, decrypting a transmission and comparing it to an expected plaintext value.  (See Lear's Response, Ex. D, Rubin Dep. at 104.)  By the very definition of rolling-code

---

[5]Beyond denying that the HomeLink receiver does any sort of "prediction," JCI's counsel also contended at oral argument that this device does not make any sort of "comparison," but instead merely ***subtracts*** an internal "counter value" from the decrypted signal.  When dealing with numerical values, however, most grade schoolers understand that the two equations (i) $x = x$ (comparison), and (ii) $x - x = 0$ (subtraction) are merely two different ways of expressing the same mathematical concept.  Such trivial distinctions, in the Court's view, illustrate a key purpose of the doctrine of equivalents, as it would be pointless to insist that an inventor explain that a comparison between numerical values can be accomplished through subtraction.

encryption, after all, the acceptable (or "expected") signal that will open a garage door *changes* with each press of a button, and the receiver must therefore be able to anticipate (or "predict") these changes. Against this technological backdrop, and in light of the testimony of Lear's expert, the Court finds that the semantic distinctions drawn by JCI and its counsel — *i.e.,* between the "prediction" of an "expected" signal, on one hand, and the continual updating of an "acceptable" range within which a decrypted value must lie, on the other — do not defeat as a matter of law Lear's appeal to the doctrine of equivalents. Rather, it must be left to the trier of fact to determine the significance of these distinctions.

## C. Claims 1 and 4 of the Roddy Patent Are Invalid as Anticipated.

As the next issue raised in its summary judgment motion regarding the Roddy patent, JCI contends that claims 1 and 4 through 8 of this patent are invalid under various subsections of 35 U.S.C. § 102. In particular, JCI argues that each of the claimed inventions was either (i) described in one or more publications that qualify as prior art, see 35 U.S.C. § 102(b), (ii) anticipated by a patent that was granted pursuant to an application filed before this invention, see 35 U.S.C. § 102(e)(2), or (iii) made by another inventor first, see 35 U.S.C. § 102(g)(2). As discussed below, the Court agrees that claims 1 and 4 are invalid on one or more of these grounds, but finds that JCI has failed to establish its entitlement to summary judgment as to claims 5 through 8.

### 1. The Court Has Not Been Divested of Jurisdiction to Address JCI's Challenges to the Validity of Claim 1.

Before turning to the substance of JCI's counterclaims of invalidity, the Court first must address Lear's threshold contention that JCI's attack upon the validity of claim 1 is no longer judicially cognizable in light of certain developments during the course of this litigation. Lear first advanced this argument in its response to JCI's summary judgment motion, stating tersely that this Court "lacks jurisdiction to invalidate" claim 1 because "Lear has not asserted, and will never assert, claim 1 against JCI." (Lear's Response Br. at 11.) When the Court pointed out at oral argument that Lear had, in fact, affirmatively alleged infringement of claim 1 in both its initial and amended complaints, (see Complaint at ¶ 14; Amended Complaint at ¶ 15), Lear's counsel responded that Lear had not "actively pursue[d] Claim 1 infringement" in the course of this litigation, as purportedly evidenced by its interrogatory responses and the report of its expert. Lear further offered to provide a covenant not to sue JCI for infringement of claim 1, and it has since filed two such covenants with the Court. Despite all of these efforts to avoid a judicial determination as to the validity of claim 1, the Court finds that it retains the jurisdiction to reach this issue, and that to do so would be an appropriate exercise of the Court's discretionary authority under the Declaratory Judgment Act, 28 U.S.C. § 2201.

Lear's initial jurisdictional challenge in its response to JCI's motion merits little discussion. Simply stated, Lear's averment that it "has not asserted, and will never assert, claim 1 against JCI" is ***not true***, in light of the ***express allegation*** in its complaint that JCI's HomeLink system infringes "claims 1 through 13" of the Roddy patent. (Amended Complaint at ¶ 15.) Lear has never sought to amend this pleading to limit the scope of its

27

claims of infringement. Moreover, JCI's counterclaim explicitly challenges the validity of claim 1 on a number of grounds. These unamended pleadings, standing alone, indisputably confer upon the Court the jurisdiction to address JCI's challenges to the validity of claim 1. The sole authority cited in Lear's response brief, <u>Weatherchem Corp. v. J.L. Clark, Inc.</u>, 163 F.3d 1326, 1336 (Fed. Cir. 1998), is not to the contrary, as the district court judgment in that case extended beyond "the asserted claims" and purported to invalidate two patents in their entirety.

Lear's more serious contention, however, is that JCI's challenges to the validity of claim 1 are now moot, and hence beyond the power of this Court to address, in light of certain developments in the course of these proceedings. First, Lear points to various indicia during discovery that it was not "actively pursuing" any claim that JCI's HomeLink system infringes claim 1 of the Roddy patent. At oral argument, for example, Lear's counsel cited statements in the September 27, 2005 report of Lear's expert, Dr. Rubin, that he had been "informed [that] claim 4 is the broadest asserted claim," and that his report referenced claim 1 only as reflecting "the implied limitations" of dependent claim 4. Lear's counsel also pointed to December 3, 2004 interrogatory responses in which Lear stated that JCI's HomeLink system infringed "at least" claims 4-8 of the Roddy patent. Similarly, in a supplemental brief filed after oral argument, Lear cites statements in the October 28, 2005 rebuttal report of JCI's expert, Dr. Thomas Xydis, that he had been "advised that the plaintiffs in this matter have stated that the HomeLink system literally infringes Claims 4-7 of the [Roddy] patent," and that he had been

"informed that the claims at issue in this case are 4-7."[6]  Finally, Lear points to a February

25, 2005 opinion letter from JCI's counsel identifying "Claims 4-8" as "the claims

asserted from [the Roddy] patent."  From all of this, Lear concludes that it was evident by

the latter stages of the discovery period that claim 1 was not being asserted against JCI.

The various indicia cited by Lear, however, are far too indefinite to divest this

Court of jurisdiction over claims and counterclaims that remain a part of the pleadings.

Surely, an expert's statement of the issues he has been asked to address cannot be viewed

as a legally binding admission that no other issues can or will be litigated.  And the only

statement in the record by Lear itself — *i.e.,* its interrogatory answer that the HomeLink

system infringes "at least" claims 4 through 8 of the Roddy patent — plainly does not

foreclose its pursuit of the claim, as expressly asserted in its complaint, that this system

also infringes claim 1.  There are customary ways to remove such a claim from further

judicial consideration — *e.g.,* a motion under Fed. R. Civ. P. 15(a) to amend the

complaint, or a motion for voluntary dismissal under Fed. R. Civ. P. 41(a)(2) — but Lear

does not contend that it pursued these available avenues at any time.[7]  Neither has it

---

[6]As JCI points out in response, however, Dr. Xydis's rebuttal report also states that he
had been "asked . . . to review and analyze Claims 1, 4, 5, 6, 7 and . . . 8 of" the Roddy patent.
In addition, his initial September 30, 2005 expert report states that he had been "advised that the
plaintiffs in this matter have stated that the Home[]Link system literally infringes claims 1, 4, 5,
6, 7 and 8 of" the Roddy patent.

[7]At oral argument and in its post-hearing submissions, Lear has argued at length about
JCI's purportedly ample notice that claim 1 was no longer at issue, and has concluded from this
that JCI cannot plausibly claim any unfair surprise or resulting prejudice.  While the absence of
unfair surprise or prejudice might be relevant to the Court's resolution of a motion under Fed. R.
Civ. P. 15(a), see Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962), or under Fed. R.

identified any support for the proposition that a court's jurisdiction over a claim may be lost through a party's mere failure to actively pursue it during discovery, or even a party's express disavowal of the claim during discovery. Even then, there would remain the question whether a party's unilateral failure to pursue or decision to abandon a claim, standing alone, would divest a court of jurisdiction over the ***opposing party's*** counterclaims.

In apparent recognition that its course of conduct in discovery had no such jurisdictional effect, Lear points to its more recent, and increasingly definitive, statements that it will not sue JCI for infringement of claim 1 of the Roddy patent. As noted, Lear stated in its response to JCI's summary judgment that it "has not asserted, and will never assert, claim 1 against JCI." (Lear's Response Br. at 11.) While this is a dubious characterization of Lear's past conduct, this statement nonetheless appears to reflect Lear's abandonment of such a claim at present and into the future. As Lear points out, the Federal Circuit has held that an attorney's statement in a motion or brief promising that the client would not sue the opposing party for infringement as to any claim of the patent-in-suit operates as a binding covenant not to sue, and further serves to divest a district court of jurisdiction over a counterclaim seeking a declaration of the patent's validity. See <u>Super Sack Manufacturing Corp. v. Chase Packaging Corp.</u>, 57 F.3d 1054,

---

Civ. P. 41(a)(2), <u>see</u> <u>Grover v. Eli Lilly & Co.</u>, 33 F.3d 716, 718 (6th Cir. 1994), there is no apparent reason for the Court to weigh these factors in the absence of such a motion.

1059-60 (Fed. Cir. 1995).[8]  Moreover, by following up the statement in its brief with an express covenant not to sue JCI for infringement of claim 1 of the Roddy patent, Lear argues that it has removed all doubt about the continuing justiciability of JCI's counterclaim challenging the validity of claim 1.  See Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855-56 (Fed. Cir. 1999).[9]

The Court harbors serious reservations about this "bursting bubble" theory of subject matter jurisdiction, under which a party's unilateral withdrawal of a claim of infringement at *any time* before judgment is entered on the opposing party's counterclaim of invalidity immediately and invariably divests the court of jurisdiction over *both* the claim of infringement *and* the opposing party's counterclaim.[10]  The Court need not

_____

[8]As the Federal Circuit has recognized in its recent decisions, see, e.g., Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp., 482 F.3d 1330, 1338 (Fed. Cir. 2007); SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1379-80 (Fed. Cir. 2007), the jurisdictional test applied in Super Sack was rejected by the Supreme Court in MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764, 774 n.11 (2007).  In particular, while the court in Super Sack found that the counterclaiming party lacked a "reasonable apprehension" that it would "face an infringement suit" in light of the opposing party's promise not to bring such a suit, Super Sack, 57 F.3d at 1058-59, the Supreme Court held in MedImmune that this "reasonable apprehension of suit" test was contrary to or in tension with a number of the Court's prior precedents.  See MedImmune, 127 S. Ct. at 774 n.11.  Because, as explained below, this Court finds that Super Sack is distinguishable here, it need not decide whether (or to what extent) this Federal Circuit ruling remains viable in the wake of MedImmune.

[9]After Lear filed its initial covenant not to sue, JCI raised a number of challenges to this filing, including (i) that it named only one of the two Plaintiffs, and (ii) that it did not extend to JCI's customers or suppliers.  Lear has since filed an amended covenant not to sue that removes these two limitations.

[10]It is clear that a judgment of non-infringement does not invariably moot a counterclaim of invalidity.  See Altvater v. Freeman, 319 U.S. 359, 363-64, 63 S. Ct. 1115, 1117-18 (1943).  It seems implausible, then, that a party's unilateral withdrawal of an infringement claim should have this effect.

resolve this question, however, because it agrees with JCI that the specific covenant

provided by Lear in this case does not have such a jurisdictional effect. As noted, Lear

alleged in its complaint that JCI's HomeLink system infringed ***all thirteen claims*** of the

Roddy patent. Its covenant not to sue, in contrast, encompasses only claim 1 of this

patent. Thus, Lear has preserved its right to pursue claims of infringement against JCI as

---

Moreover, such a result seemingly runs counter to Fed. R. Civ. P. 41(a)(2), under which a court may not grant a plaintiff's request for voluntary dismissal "[i]f a counterclaim has been pleaded by a defendant" and this counterclaim could not "remain pending for independent adjudication by the court" in the absence of the plaintiff's claim. The jurisdictional theory advocated by Lear in this case would permit a plaintiff to bypass this Rule 41(a)(2) limitation by announcing at any time before judgment that it was abandoning its claim and relinquishing any right to pursue it in the future. In other words, so long as a plaintiff is willing to accept the dismissal of its infringement claim with prejudice, jurisdictional principles purportedly would demand ***both*** that the plaintiff must be allowed to do so ***and*** that the opposing party's counterclaim must be dismissed as moot, without the need to invoke the mechanism of Rule 41(a)(2) or secure the "order of the court" called for under that provision.

To be sure, and as other courts have observed, the requirements of Rule 41(a)(2) cannot trump the Article III "case or controversy" limitation upon federal court jurisdiction. See, e.g., Super Sack, 57 F.3d at 1057 & n.2; Ciber, Inc. v. Ciber Consulting, Inc., 326 F. Supp.2d 886, 892 (N.D. Ill. 2004). This Court views the Rule and constitutional command as wholly consistent, however, when one considers the gatekeeping role assigned to the courts under Rule 41(a)(2). Simply stated, once a plaintiff has pleaded a claim and the defendant has served an answer, Rule 41(a) dictates that the plaintiff cannot voluntarily dismiss its claim absent either the defendant's stipulation or an order of the court. Much as a plaintiff might wish to abandon a claim, then, the Rule makes clear that there is no absolute entitlement to unilaterally do so once the defendant has answered the claim. Rather, the plaintiff must either secure the defendant's agreement or persuade the court to allow dismissal. If the plaintiff fails to do so — and, as noted, the existence of a counterclaim without a basis for "independent adjudication" is one reason why such an effort might fail — then the claim goes forward and the court's subject matter jurisdiction is preserved. See Lackner Co. v. Quehl Sign Co., 145 F.2d 932, 934 (6th Cir. 1944) (affirming, on this and other grounds, a district court's ruling on an invalidity counterclaim despite the plaintiffs' motion to dismiss their infringement claims with prejudice and their offer to grant a free license to the defendant). This Court does not read the Article III "case or controversy" requirement as mandating that a party be allowed to walk away from its pleadings at any time and without any restrictions, much less that this entitlement should extend to pulling the jurisdictional rug out from under an opposing party's properly pleaded counterclaim.

to twelve of the thirteen claims of the Roddy patent — and, of course, it continues to actively assert several such claims in this litigation.

Under analogous circumstances, other courts have held that a covenant not to sue or a voluntary dismissal encompassing less than all of a patent's claims does not divest the court of jurisdiction over a counterclaim of patent invalidity. In <u>F.B. Leopold Co. v. Roberts Filter Manufacturing Co.</u>, 1995 WL 776945, at *1-*2 (W.D. Pa. Aug. 2, 1995), for example, plaintiff F.B. Leopold moved for the dismissal of defendant Roberts Filter's counterclaims of invalidity as to claims 1-15 and 17-19 of the patent-in-suit, contending that there was no longer any "actual case or controversy" with respect to these counterclaims because F.B. Leopold had "limited its claims of infringement to claims 16 and 20 in answers to interrogatories." F.B. Leopold argued, as Lear does here, that dismissal of the counterclaims was mandated in accordance with the Federal Circuit's ruling in <u>Super Sack</u>.

The district court disagreed. The court first noted that <u>Super Sack</u> addressed the jurisdictional effect of a broad promise not to sue for infringement as to "any claim of the patents-in-suit." <u>F.B. Leopold</u>, 1995 WL 776945, at *2 (quoting <u>Super Sack</u>, 57 F.3d at 1056). The court then observed that this promise was "significantly different from the promise offered by [F.B.] Leopold in this case," which did not "eliminate all allegations of patent infringement" against defendant Roberts Filter, but instead left these allegations intact as to two claims of the patent-in-suit. <u>F.B. Leopold</u>, 1995 WL 776945, at *2. Because F.B. Leopold had directed "general threats of infringement" toward Roberts

Filter's customers based on the patent-in-suit, and because it had "actually filed a suit alleging general claims of infringement" of this patent, the court found that it retained jurisdiction over Roberts Filter's invalidity counterclaims despite F.B. Leopold's abandonment of some (but not all) of its infringement claims. 1995 WL 776945, at *3; see also Syngenta Seeds, Inc. v. Monsanto Co., 2004 WL 2790498, at *1 n.1 (D. Del. Nov. 22, 2004) (denying a motion to dismiss the defendants' counterclaims "relating to the validity of unasserted claims" of the patent-in-suit, and finding that Super Sack was distinguishable because the patentee in that case "withdrew the entire patent from controversy, not just discrete claims").

The Sixth Circuit reached a similar conclusion in a decision that predates the establishment of the Federal Circuit Court of Appeals. In Sterling Aluminum Products, Inc. v. Bohn Aluminum & Brass Corp., 298 F.2d 538 (6th Cir. 1962), the plaintiff's complaint included a broad claim of patent infringement based upon all fourteen claims of the patent-in-suit, and the defendant likewise filed a counterclaim asserting invalidity of the entire patent. The plaintiff subsequently narrowed its claim of infringement on two separate occasions, initially indicating that it was asserting only four of the patent's fourteen claims, and then stating shortly before trial that it was focusing on just two of these claims. Sterling Aluminum, 298 F.2d at 538. Despite these developments, the district court "held that the validity of all the claims of the patent had been placed in issue by the complaint and the counterclaim," and that "these pleadings presented an 'actual controversy'" within the meaning of the Declaratory Judgment Act. 298 F.2d at 538.

The Sixth Circuit affirmed, agreeing with the district court "that an actual controversy as to the validity of the entire patent had been created by the pleadings, and that it was appropriate to adjudicate this controversy in its entirety." 298 F.2d at 540; see also Shelcore, Inc. v. Durham Industries, Inc., 745 F.2d 621, 624 (Fed. Cir. 1984) (holding that the plaintiff in that case "could not unilaterally remove the validity issue" as to claim 13 of the patent-in-suit by voluntarily dismissing with prejudice its charge of infringement as to this claim, where the defendant's "counterclaim put [the] validity of all the claims in issue"); cf. Jervis B. Webb Co. v. Southern Systems, Inc., 742 F.2d 1388, 1399 & n.8 (Fed. Cir. 1984) (holding that jurisdiction was lacking over a counterclaim challenging the validity of claims that the plaintiff had not asserted or litigated, but emphasizing that this ruling did not "preclude the issuance of a declaratory judgment that all claims are valid or invalid in response to, *inter alia,* . . . the filing of a declaratory judgment counterclaim asserting the invalidity of all of patentee's claims in response to a complaint that asserted the infringement of all of the claims").[11]

    The cases cited in Lear's post-hearing submissions are not to the contrary, but

---

    [11]In one of its post-hearing submissions, Lear challenges JCI's reliance on case law that predates the Super Sack decision. Yet, as is evident from the discussion in the text accompanying this footnote, this Court also has looked to rulings issued prior to Super Sack. As explained earlier, and as the Federal Circuit itself has recognized, see, e.g., Teva Pharmaceuticals, 482 F.3d at 1338-40, the Supreme Court's recent MedImmune decision effectively overruled the jurisdictional test applied in Super Sack and other contemporaneous Federal Circuit decisions. Under these circumstances, the Court deems it appropriate to consider Federal Circuit case law that predates that court's application of the now-rejected "reasonable apprehension of suit" test. It also bears emphasis that the Federal Circuit itself has never disavowed these earlier rulings, but has merely gone in a different analytical direction following its adoption of the "reasonable apprehension of suit" standard.

instead involve allegations of infringement of only *some* of the claims of the patents-in-suit.  In Biogen, Inc. v. Amgen, Inc., 913 F. Supp. 35, 36, 39-40 (D. Mass. 1996), for example, the plaintiff alleged that the defendant had infringed several, but not all, of the claims of the patent-in-suit, and then stated in subsequent submissions that it was further narrowing the issues in the case by asserting only two of these claims.  The defendant filed a counterclaim seeking to invalidate the patent in its entirety, but the plaintiff argued that this counterclaim should be limited only to those claims that were alleged to be infringed.  The court agreed, observing that the plaintiff "does not now allege, and promises never to allege in the future, that [the defendant] has infringed any of" the additional claims that the defendant sought to put at issue in its counterclaim.  Biogen, 913 F. Supp. at 38-40.  In so ruling, the court noted that the Federal Circuit had "specifically rejected" the "notion that a plaintiff's choice to litigate certain patent claims and not others constitutes assent to jurisdiction over the entire patent."  913 F. Supp. at 38 (citing Jervis B. Webb, 742 F.2d at 1399); see also Lifetime Products, Inc. v. Correll, Inc., 323 F. Supp.2d 1129, 1132, 1151 (D. Utah 2004) (noting the plaintiff's allegation that the defendants' products infringed "various claims" of the patents-in-suit, and finding that this limitation, along with a subsequent covenant not to sue as to a subset of these claims, divested the court of subject matter jurisdiction over the defendants' counterclaims of invalidity to the extent that they exceeded these limitations); Ultradent Products, Inc. v. Life-Like Cosmetics, Inc., 924 F. Supp. 1101, 1114 (D. Utah 1996) (noting that the plaintiff had "only asserted certain claims as infringed" by the defendant, and concluding

that only these "asserted claims are properly before the court for a consideration of their validity"), aff'd in part and rev'd on other grounds, 127 F.3d 1065 (Fed. Cir. 1997).

Because none of these cases addresses the jurisdictional effect of allegations that *all* of a patent's claims have been infringed, the decisions cited by Lear do not call into question the distinction drawn by the Federal Circuit in Jervis B. Webb, 742 F.2d at 1399 & n.8. In particular, the court in that case distinguished between (i) a case like the one before it, where the plaintiff's initial complaint "assert[s] the infringement of less than all of [the patent's] claims," and (ii) a case where the plaintiff's complaint "assert[s] the infringement of all of the claims" of the patent-in-suit. 742 F.2d at 1399-1400 n.8. While a defendant's counterclaim in the former sort of case generally is limited to the claims asserted by the plaintiff, a defendant in the latter sort of case may properly "file[] . . . a declaratory judgment counterclaim asserting the invalidity of all of patentee's claims." 742 F.2d at 1399-1400 n.8. Likewise, in the present case, Lear has asserted *all* of the Roddy patent's thirteen claims in its initial and amended complaints, and has never sought to further amend its pleadings to reflect a more limited claim of infringement. Nor has Lear's recent covenant not to sue swept as broadly as these pleadings by removing all of the Roddy patent's claims from further judicial scrutiny. Under these circumstances, the Court finds that the allegations of Lear's complaint created an "actual controversy" as to the validity of the Roddy patent, see 28 U.S.C. § 2201(a), and that this issue has not been mooted by Lear's subsequent (and limited) promise to abandon and never again pursue an infringement claim against JCI based upon claim 1 of this patent.

Notwithstanding this resolution of Lear's jurisdictional challenge, the Court

recognizes that it retains the discretion under the Declaratory Judgment Act to forgo a

ruling on JCI's challenge to the validity of claim 1.  See 28 U.S.C. § 2201(a) (providing

that the court "*may* declare the rights and other legal relations of any interested party

seeking such declaration" (emphasis added)); see also MedImmune, 127 S. Ct. at 776

(observing that this statutory language "has long been understood to confer upon federal

courts unique and substantial discretion in deciding whether to declare the rights of

litigants" (internal quotation marks and citations omitted)).  Yet, Lear has not suggested a

basis for the Court to decline to exercise its discretionary power to decide this

counterclaim.  To the contrary, it is difficult to view Lear's tactics in this case as anything

other than an eleventh-hour attempt to pull the jurisdictional rug out from under a

counterclaim that it could not defend against on the merits.  The parties having proceeded

through discovery without Lear having affirmatively withdrawn its allegation of

infringement of claim 1, and JCI having filed a motion seeking summary judgment in its

favor as to the invalidity of this claim, the Court believes that it is far too late in the day

for Lear to now contend, after JCI's motion has been fully briefed and argued, that the

Court should refrain from deciding this matter.[12]

---

[12]It is worth noting that the Court could well have ruled upon this matter at the conclusion of the October 26 hearing, rather than taking JCI's motion under advisement and creating a window of opportunity for Lear to flesh out its jurisdictional argument and file a covenant not to sue.  As explained earlier, the Court views this post-hearing covenant as Lear's first clear and direct statement that it was abandoning, once and for all, any claim against JCI for infringement of claim 1 of the Roddy patent.  If the Court had the discretion to decide JCI's counterclaim at the October 26 hearing, it is difficult to see how any unilateral post-hearing actions by Lear

Moreover, JCI has identified two additional reasons why the Court should address its counterclaim. First, an award of judgment in JCI's favor on this counterclaim would confer "prevailing party" status, and thus make JCI eligible to seek an award of attorney fees. See 35 U.S.C. § 285. Next, and as discussed in greater detail below, one of JCI's challenges to the validity of claim 1 rests upon the premise that this claim was anticipated by certain materials published more than a year before the filing of the Roddy patent application. Because this same proposition also is relevant to another of JCI's counterclaims — namely, that the Roddy patent is unenforceable for inequitable conduct — JCI argues that a ruling on this question would serve the salutary purpose of narrowing the issues remaining for trial. See Fed. R. Civ. P. 56(d). Finally, beyond these factors cited by JCI, the Supreme Court has "emphasized the importance to the public at large of resolving questions of patent validity," and has cautioned that undue restraint in the courts' consideration of such questions may "prolong[] the life of invalid patents" and "encourage[] endless litigation (or at least uncertainty) over the validity of outstanding patents." Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 100-02, 113 S. Ct. 1967, 1977-78 (1993). In light of all of these considerations, the Court deems it appropriate to reach and resolve JCI's challenges to the validity of claim 1 as raised in its present summary judgment motion.

## 2. The HiSeC Documentation Anticipates Claim 1.

could have weakened JCI's entitlement to the exercise of this discretion.

Returning to the merits of JCI's counterclaims of invalidity, JCI first challenges claim 1 of the Roddy patent as anticipated by a series of documents published by National Semiconductor Corporation ("NSC") between May 1994 and August 1995. (See JCI's Motion, Ex. 18.) These documents collectively describe a product called "HiSeC," a rolling-code system intended for use in the GDO and home security markets. Citing the testimony of Lear's expert, Dr. Rubin, and Lear's response to a request for admission, JCI contends that this collection of documents describes each of the elements of claim 1 of the Roddy patent. The Court readily concurs.

Under the pertinent portion of § 102(b), a patent is anticipated, and hence invalid, if it was "described in a printed publication . . . more than one year prior to the date of the application for patent." The application for the Roddy patent was filed on October 10, 1996, so the "HiSeC" documents published by NSC between May 1994 and August 1995 meet the temporal requirement for treatment as prior art under § 102(b). It remains only to ask, therefore, whether each of the elements and limitations of claim 1 of the Roddy patent can be found within this prior art. See Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991). As anticipation is a factual issue, see Scripps Clinic, 927 F.2d at 1576, JCI is entitled to summary judgment in its favor only if, viewing the evidence in a light most favorable to Lear and drawing all reasonable factual inferences in its favor, the disclosure of claim 1 in the prior art is established as a matter of law. In conducting this inquiry, the Court must be mindful of the principle that patents are presumed valid, see 35 U.S.C. § 282, so that JCI bears the burden of

demonstrating by clear and convincing evidence that the Roddy patent is invalid. See

Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1576 (Fed. Cir. 1996).

As shown by JCI, anticipation is established here by the admissions of Lear itself

and the testimony of its own expert. For its threshold showing, JCI cites the declaration

of its expert, Dr. Xydis, who has opined that each limitation of claim 1 is found in the

HiSeC documentation. (See JCI's Motion, Ex. 14, Xydis Expert Report at 14-17.) JCI

next points to the following testimony elicited from Lear's expert, Dr. Rubin:

> Q:     . . . . [A]s to claim one, in your view, the NSC HiSeC
>        specification has all the elements of claim one with the
>        exception of encryption, correct?
>
> A:     Yes.

(Lear's Response, Ex. D, Rubin Dep. at 182-83.) Finally, with regard to this remaining

element of encryption, JCI cites Lear's admission during discovery that the HiSeC

documentation "describes a device for generating encrypted signals." (JCI's Motion, Ex.

20, Lear's Responses to JCI's First Request for Admissions and Second Set of

Interrogatories at 6.)

This record seemingly leaves no room for argument that the HiSeC documentation

does not anticipate claim 1. Certainly, Lear has not even attempted such an argument, but

instead has elected to rest solely upon its threshold contention, rejected above, that the

validity of claim 1 is no longer properly before the Court. In light of JCI's evidence of

anticipation, and in light of Lear's failure to identify any portion of the record that might

rebut this showing, the Court finds that JCI is entitled to summary judgment in its favor as

to the invalidity of claim 1 of the Roddy patent.

### 3. The Dykema Patent Anticipates Claims 1 and 4.

JCI next contends that claims 1 and 4 of the Roddy patent are anticipated by U.S. Patent No. 5,661,804 (the "Dykema patent"), which was applied for on June 27, 1995 and issued on August 26, 1997. (See JCI's Motion, Ex. 2.) This patent is entitled "Trainable Transceiver Capable of Learning Variable Codes," and JCI asserts that this patent was the product of the efforts of its predecessor-in-interest, the Prince Corporation, to add rolling-code technology to its existing fixed-code HomeLink product. (See JCI's Motion, Ex. 10, Robillard Decl. at ¶¶ 3-6.) Once again, the Court agrees that this patent anticipates claims 1 and 4.

In support of this particular challenge to the validity of claims 1 and 4, JCI cites § 102(e)(2), which provides that a patent is invalid if the claimed "invention was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent." As noted, the application for the Dykema patent was filed on June 27, 1995. Consequently, this provision is triggered if the Dykema patent (i) "describe[s]" the inventions in claims 1 and 4 of the Roddy patent, and (ii) qualifies as prior art because its filing date, June 27, 1995, precedes Timothy Roddy's "invention[s]" as disclosed in these two claims.

Turning first to the latter of these issues, the parties dispute the standard that should govern the threshold determination whether the Dykema patent qualifies as prior art. JCI asserts — albeit without citation to any authority, (see JCI's Motion, Br. in

42

Support at 20) — that this patent qualifies as prior art unless Lear can show (i) that Mr. Roddy conceived his invention before the June 27, 1995 filing date of the Dykema patent, and (ii) that he was diligent in reducing his invention to practice. Lear argues, in contrast, that it is improper to apply the "reasonable diligence" standard set forth at § 102(g) to a prior art determination under § 102(e), where § 102(g) by its terms applies only to determinations of "priority of invention *under this subsection,*" and where the Supreme Court in Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 119 S. Ct. 304 (1998), rejected an analogous attempt to carry over the "reduction to practice" language of § 102(g) to an on-sale bar inquiry under § 102(b).[13]

The Court is inclined to agree with Lear that the word "invention" in § 102(e) should be construed in accordance with Pfaff's interpretation of that very same word, albeit in the context of § 102(b) rather than § 102(e). Nonetheless, JCI correctly observes that Lear's appeal to Pfaff is unavailing here because, even under the standards articulated in that case, Lear has not produced evidence that would establish that Mr. Roddy's "inventions" as disclosed in claims 1 and 4 preceded the June 27, 1995 filing date of the Dykema patent. In Pfaff, the Court concluded that "[t]he word 'invention' must refer to a concept that is complete, rather than merely one that is 'substantially complete.'" Pfaff, 525 U.S. at 66, 119 S. Ct. at 311. While the Court recognized that "reduction to practice

---

[13]Lear concedes, as it must, that despite the ruling in Pfaff, the PTO continues to operate under a regulation that contemplates the showing of "due diligence" advocated by JCI here. See 37 C.F.R. § 1.131(b). Lear submits, however, that this practice should be revisited in light of Pfaff.

is sufficient evidence of completion," it declined to hold that "proof of reduction to practice is necessary in every case." 525 U.S. at 66, 119 S. Ct. at 311. Rather, the Court found that an invention could be shown to be "complete and ready for patenting" in "at least two ways: by proof of reduction to practice . . . ; or by proof that . . . the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." 525 U.S. at 66-68, 119 S. Ct. at 311-12.

Having argued that Pfaff should control here, Lear nonetheless fails to point to evidence that would meet this "complete and ready for patenting" standard. Instead, Lear merely points to evidence of Mr. Roddy's "conception" of his invention on May 9, 1995, (see Lear's Response, Ex. H), and then leaps to the conclusion that this *also* is the date of Mr. Roddy's "invention," (see Lear's Response Br. at 16-17). Yet, as Pfaff itself emphasizes, a concept must be "complete" in order to qualify as an invention. While this does not mandate evidence of reduction to practice or a showing of diligence, it *does* require evidence that an invention was "ready for patenting."

The sole evidence that Lear offers on this subject is the proof of Mr. Roddy's *conception* of his invention on May 9, 1995. This, in turn, consists of (i) a handwritten single-page document describing a "universally programmable RF transmitter" that would feature one or more "special channels" that would be capable of using rolling-code encryption technology to communicate with devices such as GDOs and alarm systems, and (ii) a typewritten single-page document generated the same day that covers largely

44

the same ground.  (See Lear's Response, Ex. H.)  Lear does not even purport to explain

how these documents would suffice to establish that Mr. Roddy's invention was "ready

for patenting."  In particular, Lear has not identified any sort of "enabling disclosure"

within these documents, such as drawings, flow charts, or specific descriptions of the

elements of Mr. Roddy's invention, that might enable someone skilled in the relevant art

to practice this invention.  See Pfaff, 525 U.S. at 67-68, 119 S. Ct. at 312; Space

Systems/Loral, Inc. v. Lockheed Martin Corp., 271 F.3d 1076, 1079-80 (Fed. Cir. 2001).

Accordingly, the Court is satisfied that the Dykema patent qualifies as prior art under §

102(e).

It remains only to determine, then, whether the Dykema patent anticipates claims 1

and 4 of the Roddy patent.  With regard to claim 1, JCI once again points, as a threshold

matter, to the opinion of its expert, Dr. Xydis, that each of the limitations of this claim is

disclosed in the Dykema patent.  (See JCI's Motion, Ex. 14, Xydis Expert Report at 10-

12.)  JCI then cites, once again, the acknowledgment of Lear's expert, Dr. Rubin, that

each element of claim 1 is found in the Dykema patent, with the exception of encryption.

(See Lear's Response, Ex. D, Rubin Dep. at 145.)  This leaves only the question, then,

whether this element of encryption is, in fact, disclosed in the Dykema patent.

JCI argues, and the Court agrees, that this question is conclusively resolved by

reference to the deposition testimony of Dr. Rubin.  First, while Dr. Rubin opined in one

of his expert reports that the Dykema patent was devoid of "any mention of the words

'encrypt' or 'encrypted,'" (JCI's Motion, Ex. 24, Rubin Expert Rebuttal Report at 2), he

was forced to concede at his deposition that the term "encrypt" does, in fact, appear in figure 13 of this patent. (See Lear's Response, Ex. D, Rubin Dep. at 155; see also JCI's Motion, Ex. 2, Dykema Patent Fig. 13.) Dr. Rubin further acknowledged that, when people of ordinary skill in the art saw the term "encrypt" back in 1995 (the time of the filing of the Dykema patent), they would have understood it to refer to the function of "encryption" as he defined it. (See Lear's Response, Ex. D, Rubin Dep. at 133-34.) It follows that the Dykema patent, through its reference to the term "encrypt," discloses encryption as that term is defined by Lear and its expert, Dr. Rubin.

Pointing to a different portion of Dr. Rubin's testimony, however, Lear insists that the reference to "encrypt[ion]" in the Dykema patent does not necessarily disclose the element of "encryption" as set forth in claim 1 of the Roddy patent. In particular, Dr. Rubin testified at one point that a true "encryption" algorithm, as he would define it, cannot be a purely linear function because the resulting codes would be "trivial to break." (Id. at 91-92.) This testimony, in Lear's view, raises an issue of fact as to whether the references to "encrypt[ion]" in the Roddy and Dykema patents share the same meaning. Yet, leaving aside Dr. Rubin's own subsequent concession on this point as noted above — i.e., his testimony that a reference to "encrypt[ion]" in the Dykema patent, without more, would have been understood by practitioners of the relevant art at the time as meaning the function of "encryption" as he defined it, (see id. at 133-34) — Lear has failed to identify any language in the Roddy patent that would mandate non-linear encryption. Rather, the patent only specifies, at most, that the encryption must "var[y]"

46

or "change[] sequentially," to avoid interception of a scrambled but nonetheless fixed signal.  (See Roddy Patent at 1:32-38, 1:55-57.)  Because Lear has provided no basis for concluding that the Roddy patent's use of the term "encryption" corresponds strictly to Dr. Rubin's narrow definition of this term as encompassing only non-linear algorithms, the Court finds that the Dykema patent discloses the "encryption" element of the Roddy patent.  It follows that the Dykema patent anticipates claim 1 of the Roddy patent.

Turning to claim 4, JCI's expert, Dr. Xydis, once again has opined that the Dykema patent discloses each element of this claim.  (See JCI's Motion, Ex. 14, Xydis Expert Report at 19.)  In response, Lear and its expert, Dr. Rubin, contend that the Dykema patent lacks the element of encryption — an assertion addressed (and rejected) above — and that this patent also fails to disclose a multiple-button transmitter that transmits a **combination** of fixed and rolling codes.  As to the latter, Dr. Rubin opined at his deposition that he reads the Dykema patent as indicating that each of the transmitter's buttons must transmit precisely the same type of code — i.e., either all fixed or all rolling codes, but not a combination of the two.  (See Lear's Response, Ex. D, Rubin Dep. at 271.)

The Court agrees with JCI that Dr. Rubin's testimony on this point rests upon an untenable reading of the Dykema patent.  In forming his opinion that each button as described in the Dykema patent must transmit the same type of code, Dr. Rubin evidently relies on two portions of this patent.  First, he points to figure 8, a flow chart depicting how to program or train one of the transmitter's buttons.  In Dr. Rubin's view, this flow

chart fails to disclose how one would proceed to program ***another*** button after programming the first one.  (See Lear's Response, Ex. D, Rubin Dep. at 148-50, 278.) Yet, he acknowledged that the patent discloses the control of multiple devices, and also "says that you can program all the buttons" on the transmitter.  (Id. at 148, 150.)  Under these circumstances, the Court readily concludes that the patent's disclosures are sufficient, when combined with the knowledge possessed by a person skilled in the art, to put such a person in possession of the invention set forth in claim 4 of the Roddy patent. See In re Elsner, 381 F.3d 1125, 1128 (Fed. Cir. 2004).  In particular, the Court harbors no doubt that such a person would readily ascertain the need to simply ***repeat*** the process depicted in figure 8 of the Dykema patent in order to program the next transmitter button.

Next, Dr. Rubin cites a passage at 6:51-58 of the Dykema patent as purportedly indicating that the transmitter's buttons must all transmit the same type of code, either fixed or rolling.  (See Lear's Response, Ex. D, Rubin Dep. at 270-71, 277-78.)  The paragraph that includes this passage reads as follows:

> As described above, switches 44, 46, and 47 [*i.e.,* the transmitter buttons] may each correspond to a different device to be controlled such as different garage doors, electrically operated access gates, house lighting controls or the like, each of which may have their own unique operating RF frequency, modulation scheme, and/or security code.  Thus, switches 44, 45, and 47 correspond to a different radio frequency channel for trainable transceiver 43.  Once the RF channel associated with one of switches 44, 45, and 47 has been trained to an RF activation signal B transmitted from a portable, remote transmitter 65 associated with a garage door opener 66 (for example), transceiver 43 will then transmit an RF signal T having the same characteristics as activation signal B to actuate a device such as a garage door opener when the corresponding switch (44, 45, 47) is momentarily depressed.  Thus, by identifying and storing the carrier frequency,

48

modulation scheme, and data code of a received RF activation signal B originating from a remote transmitter 65, transceiver 43 may subsequently transmit an RF signal T having the identified characteristics of RF signal B that are necessary to actuate a device such as garage door opener 66. Each RF channel may be trained to a different RF signal B such that a plurality of devices in addition to a garage door opener 66 may be activated by depressing a corresponding one of switches 44, 46, and 47. Such other devices may include additional garage door openers, a building's interior or exterior lights, a home security system, or any other household appliance capable of receiving an RF control signal.

(JCI's Motion, Ex. 2, Dykema Patent at 6:44-7:5.) Dr. Rubin cites the "same characteristics" portion of this paragraph in support of his view that all of the transmitter's buttons must transmit the same type of code. (Lear's Response, Ex. D, Rubin Dep. at 270-71, 277-78.)

This reading of this passage is implausible, to put it mildly. The "same characteristics" language of this paragraph plainly contemplates a match between (i) the signal "B" generated by a "portable, remote transmitter associated with a garage door opener," and (ii) the signal "T" generated by the patented transceiver when one pushes the *particular button* that has been trained to the signal emitted by the portable, remote GDO transmitter. Unless the characteristics of signals "B" and "T" are the same, the patented device presumably would fail to replicate the portable, remote transmitter and activate the GDO. This passage, simply stated, says *nothing* about the characteristics of the signal transmitted by the press of one button versus another on the patented device. Rather, it explains the training and subsequent operation of a single button.

Accordingly, there is nothing in the Dykema patent that limits the disclosed

49

invention to the exclusive transmission of fixed codes or rolling codes, but not a combination of the two. Rather, the most that could perhaps be said is that the patent fails to affirmatively state that the transmitter's multiple buttons can be trained to transmit a combination of fixed and rolling codes. Yet, the patent expressly describes its invention as "a trainable transceiver . . . for incorporation in a universal garage door opener," and it further states that this transceiver must be "capable of learning and subsequently transmitting an activation signal to a receiver utilizing a cryptographic algorithm." (JCI's Motion, Ex. 2, Dykema Patent at 1:64-66, 4:51-53.) As is evident from the background discussion in this patent regarding the relevant technological developments at the time, and as Mr. Roddy confirmed at his deposition, (see Lear's Response, Ex. E, Roddy Dep. at 20-21), the introduction of rolling-code GDOs in the early-to-mid 1990s dictated that a truly "universal" GDO had to communicate with both fixed- and rolling-code systems. From all this, the Court finds that the Dykema patent sufficiently described the invention in claim 4 of the Roddy patent, including the element of transmitting a combination of fixed and rolling codes, to permit a person skilled in the relevant art to be put in possession of the claimed invention. See Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1380 (Fed. Cir. 2002) (explaining that "[u]nder the doctrine of inherency, if an element is not expressly disclosed in a prior art reference, the reference will still be deemed to anticipate a subsequent claim if the missing element is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary

skill" (internal quotation marks and citation omitted)).[14]

### 4. JCI's Cursory Challenge to the Validity of Claims 5 Through 8 Lacks Support in the Record.

As its final challenge to the validity of the Roddy patent, JCI advances the bare assertions, unsupported by any argument or analysis, that claims 5 through 8 of this patent "add minor variations to the claimed invention," and that "the limitations of these claims are found in or obvious in view of the Dykema patent." (JCI's Motion, Br. in Support at 22.) Yet, as Lear points out in response, each of these claims includes the requirement of an "add-on receiver having encryption logic." The Dykema patent makes no reference to such an add-on receiver, and JCI notably fails to contend otherwise (or even address this point) in its reply in support of its motion. Accordingly, the Court rejects JCI's perfunctory attempt to invalidate claims 5 through 8 of the Roddy patent.

### D. The Record Does Not Establish as a Matter of Law That the Roddy Patent Is Unenforceable for Inequitable Conduct.

As the final argument advanced in its motion regarding the Roddy patent, JCI argues that this patent should be deemed unenforceable because of the purportedly inequitable conduct engaged in by the in-house counsel of Lear's predecessor-in-interest, United Technologies Automotive ("UTA"), during the course of patent prosecution. Specifically, JCI charges that two UTA in-house attorneys, Ozer Teitelbaum and Lloyd

---

[14]Having found that claims 1 and 4 of the Roddy patent are invalid on grounds of anticipation, the Court need not decide whether the so-called "Keeloq" specifications or the product developed by JCI's predecessor-in-interest, the Prince Corporation, might also anticipate claim 1 and/or claim 4 of this patent.

Doigan, violated a duty of candor imposed by the PTO, see 37 C.F.R. § 1.56(a), by failing to disclose certain material prior art — specifically, a HiSeC product document — despite their clear awareness of this publication.[15] JCI further asserts that this violation was deliberate, and thereby constitutes inequitable conduct that renders the Roddy patent unenforceable.  See Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd., 394 F.3d 1348, 1351 (Fed. Cir. 2005).

For present purposes, Lear does not dispute that the HiSeC publication identified by JCI constitutes material prior art, nor does it claim that the two UTA in-house lawyers, Mr. Teitelbaum and Mr. Doigan, were unaware of this document.  Rather, Lear argues, first and foremost, that these two individuals were not sufficiently involved in the preparation or prosecution of the Roddy patent application to trigger a duty of candor to the PTO.  The Court agrees that, at a minimum, issues of fact remain as to whether these two lawyers owed such a duty.

Lear states without contradiction that the duty of candor imposed under the relevant PTO regulation, 37 C.F.R. § 1.56(a), applies only to individuals and not corporations.  This regulation further limits this duty to only those "individual[s] associated with the filing and prosecution of a patent application."  37 C.F.R. § 1.56(a).  The regulation then defines these individuals as encompassing:

(1)  Each inventor named in the application;

---

[15]JCI claims that there were additional breaches of this duty of candor, but it relies solely upon this one alleged violation in support of its present motion.

52

(2)  Each attorney or agent who prepares or prosecutes the application; and

(3)  Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

37 C.F.R. § 1.56(c).  Because the individuals in question here, Mr. Teitelbaum and Mr. Doigan, were neither the inventors nor the attorneys who prepared or prosecuted the Roddy patent application, a duty of candor could only have arisen as a result of their "substantive[] involve[ment] in the preparation or prosecution of the application."

Turning first to Mr Doigan, the sole evidence of his "involvement" in the preparation or prosecution of the Roddy application is his inclusion among the list of lawyers on the power of attorney for the patent.  Yet, as acknowledged by JCI's expert, attorney James Carmichael, this bare identification on a power of attorney, standing alone, would not constitute "substantive involvement" in the preparation or prosecution of a patent application.  (Lear's Response, Ex. R, Carmichael Dep. at 43-44.)  Beyond this, Mr. Doigan has stated in a declaration, and JCI does not contest, that he was "not involved (substantively or otherwise) in the preparation or prosecution of the Roddy patent application."  (Lear's Response, Ex. P, Doigan Decl. at ¶ 6.)  Accordingly, there is no basis for imposing upon him a duty of candor to the PTO, and JCI does not contend otherwise in its reply in support of its motion.

Rather, in the course of the briefing on this motion, JCI has narrowed its focus upon Mr. Teitelbaum alone.  Beyond his inclusion along with Mr. Doigan on the power of

attorney, there also is evidence (i) that Mr. Teitelbaum communicated with Mr. Roddy's supervisor, James Dowd, regarding the general topic of the Roddy patent, (see Lear's Response, Ex. I, Dowd Dep. at 89-94), (ii) that the outside attorney prosecuting the patent, Theodore Olds, identified Mr. Teitelbaum as one of his contacts at UTA, (see Lear's Response, Ex. S, Olds Dep. at 19), and (iii) that Mr. Teitelbaum was copied on a letter Mr. Olds sent to Mr. Roddy approximately two months before the filing of the patent application. Against this evidence, however, Mr. Teitelbaum has submitted a declaration stating that he, like Mr. Doigan, was not "substantively involved in the preparation or prosecution of the Roddy patent application." (Lear's Response, Ex. P, Teitelbaum Decl. at ¶ 7.)[16]

Under this record, the Court cannot find as a matter of law that Mr. Teitelbaum

---

[16]In its reply, JCI contends that Mr. Teitelbaum's declaration should be stricken as an improper attempt to use attorney/client privilege as both a sword and a shield, where this declaration purportedly addresses subjects that JCI has been precluded from exploring on account of Lear's prior assertions of privilege. In particular, JCI points to (i) objections of attorney/client privilege lodged by Lear's counsel in response to certain questions asked at the deposition of James Dowd, and (ii) Lear's withholding of certain documents exchanged between Mr. Teitelbaum and Mr. Olds on grounds of attorney/client privilege. Yet, as Lear has observed, JCI did not seek to take the deposition of Mr. Teitelbaum himself, and this presumably would have provided an opportunity to explore the assertions he now makes in his declaration. Moreover, the Court's review of the transcript of Mr. Dowd's deposition indicates that JCI was able to inquire as to the general existence, frequency, and nature of his communications with Mr. Teitelbaum, and was met with privilege objections only when it sought substantive details of these communications. In any event, given Mr. Dowd's general inability to recall the substance of these communications, it is not clear that Lear's privilege objections had much of an impact upon JCI's discovery effort. Finally, and most importantly, the Court does not view Mr. Teitelbaum's declaration as an effort to affirmatively exploit privileged communications that JCI has been unable to explore in discovery. To the contrary, as JCI itself points out, the statements in this declaration are far more generalized, amounting to Mr. Teitelbaum's blanket and largely conclusory denials of involvement in the preparation or prosecution of the Roddy application.

was substantively involved in the preparation or prosecution of the Roddy application. Though Mr. Dowd testified at his deposition as to "[m]any" discussions with Mr. Teitelbaum regarding the general topic of the merits of Mr. Roddy's invention, he denied that these discussions involved "the application particularly," and he was largely unable to recall any specifics as to these communications. (Lear Response, Ex. I, Dowd Dep. at 89-94, 104-05.) Indeed, as Lear points out, Mr. Dowd could not even say whether these communications took place before or after the Roddy patent was issued. (Id. at 104.)

In addition, the record largely tends to corroborate Mr. Teitelbaum's assertion in his declaration that upon referring Mr. Roddy to outside counsel, Theodore Olds of Howard & Howard, for the purpose of preparing and prosecuting a patent application, he was not substantively involved in the preparation or prosecution of this patent application, but rather left such matters — and, in particular, the decisions regarding which prior art to cite in the application — in the hands of the outside attorney. (See Lear Response, Ex. P, Teitelbaum Decl. at ¶¶ 4-7.) In particular, Mr. Olds testified that he had only "[a] little" interaction with Mr. Teitelbaum during patent prosecution, that he was largely left "on [his] own" in working with the inventor and pursuing this matter, and that he generally "got little feedback" from either Mr. Teitelbaum or Mr. Doigan after they referred a patent matter to him. (Lear Response, Ex. S, Olds Dep. at 23-24, 73.) And certainly, the fact that Mr. Teitelbaum was copied on a single letter sent by Mr. Olds to Mr. Roddy in the relevant time frame does not suggest a greater degree of involvement.

Against all this, JCI merely points to the largely conclusory nature of Mr.

Teitelbaum's assertions and denials in his declaration, and his failure to more explicitly and affirmatively identify what he *did* do in the course of the preparation and prosecution of the Roddy application. Yet, while this might weaken the credibility of Mr. Teitelbaum's statements in his declaration, Lear has no obligation to prove anything more at this juncture, where the present record falls well short of demonstrating as a matter of law that Mr. Teitelbaum was substantively involved in the preparation or prosecution of this application. Because JCI has not established this proposition as a matter of law, it is not entitled to summary judgment on its claim of unenforceability due to inequitable conduct.[17]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' February 1, 2006 motion for summary judgment regarding the Roddy patent is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order.

                                        s/Gerald E. Rosen
                                        Gerald E. Rosen
                                        United States District Judge

Dated: November 2, 2007

---

[17]In light of this conclusion, the Court need not reach Lear's alternative argument that the record lacks evidence of intent to deceive the PTO by deliberately withholding the HiSeC publication.

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 2, 2007, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager