# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAR AUTOMOTIVE DEARBORN, INC.
and LEAR CORPORATION,

      Plaintiffs,

v.

JOHNSON CONTROLS, INC. and
JOHNSON CONTROLS INTERIORS LLC,

      Defendants.

_____/

Case No. 04-73461
Hon. Gerald E. Rosen

## OPINION AND ORDER REGARDING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT REGARDING KOOPMAN PATENTS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ March 11, 2010 _____

PRESENT: Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I. INTRODUCTION

In this suit, Plaintiffs Lear Automotive Dearborn, Inc. and Lear Corporation

(collectively "Lear") allege that the "HomeLink" remote-control garage door opener

product manufactured and sold by Defendants Johnson Controls, Inc. and Johnson

Controls Interiors LLC (collectively "JCI") infringes several patents owned by Lear. JCI,

in turn, has asserted counterclaims of non-infringement and patent invalidity and/or

unenforceability against Lear. This Court's jurisdiction rests upon the parties' assertion

of claims and counterclaims under the federal patent laws, 35 U.S.C. § 1 *et seq.* See 28 U.S.C. § 1338(a).

Through the present motion, JCI seeks summary judgment in its favor as to its non-infringement of two of the three patents-in-suit, U.S. Patent No. Re. 36,181 and U.S. Patent No. Re. 36,752 (collectively, the "Koopman patents").[1]  In support of this motion, JCI argues that the patent claims asserted by Lear, if properly construed, are not infringed by JCI's "HomeLink 2" product because this product purportedly lacks a number of features or functions that are required elements of these claims.

This motion has been fully briefed by the parties.  Having reviewed these briefs and their accompanying exhibits, as well as the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide JCI's motion "on the briefs."  *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on this motion.

---

[1]In a separate motion, JCI sought summary judgment in its favor as to its non-infringement of the remaining patent-in-suit, U.S. Patent No. 5,731,756 (the "Roddy patent"), as well as the invalidity and unenforceability of this patent.  In an earlier opinion, the Court granted this motion in part and denied it in part.  *See Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.,* 528 F. Supp.2d 654 (E.D. Mich. 2007).

## II. FACTUAL BACKGROUND

In its earlier opinion in this case, the Court described the general nature and contours of the technology at issue, *see Lear Automotive Dearborn,* 528 F. Supp.2d at 657-58, and this discussion need not be repeated here. Rather, the Court proceeds directly to the salient elements of the two patents at issue in the present motion, as well as the relevant features of JCI's "HomeLink 2" product.

### A.     The Koopman Patents

As noted, the present motion concerns two of the three patents-in-suit, U.S. Patent No. Re. 36,181 and U.S. Patent No. Re. 36,752 ( the '181 and '752 patents or, collectively, the "Koopman patents"), which Lear owns by virtue of an assignment to Lear's predecessor-in-interest, United Technologies Automotive. These two patents, generally speaking, disclose methods of cryptographically encoding and authenticating transmissions sent from transmitters to receivers in remote keyless entry ("RKE") systems for automobiles. These inventions, according to Lear, significantly improved the security of the RKE systems that incorporated them, making it far more difficult to breach these systems. These patents — or, at a minimum, the claims at issue in this case — utilize a "rolling-code" encryption methodology, meaning that the RKE system generates a different encrypted signal each time the user pushes a given button on the transmitter. In addition, the '752 patent addresses the need to ensure that the transmitter, or key fob, in a RKE system remains synchronized with the receiver unit mounted in the automobile, even when, for example, the vehicle owner presses a button on the fob while out of range

from the car.

Under the RKE system described by the Koopman patents, each time the user presses a button on the key fob, a command — *e.g.,* lock or unlock — is sent wirelessly to the vehicle-mounted receiver. Prior to transmission, the command is encrypted at the fob, and the resulting encrypted signal is then sent to the receiver, where it is decrypted and authenticated to verify that the command was received from an appropriate fob. In order to carry out this process of encryption, decryption, and authentication, the Koopman process requires one or more "secret initial values" that are used to form the encrypted transmissions.

Each transmission, or "command word," consists of a stream of bits, or zeros and ones. As explained by Lear's expert, Dr. Avi Rubin, each such "command word" contains "all of the information needed to authenticate the request and to know which event to actuate." (JCI's Motion, Ex. 4, Rubin Report at 11-12.) A portion of each such transmission consists of "command bits," or a code representing the command selected by the user through pushing one or more buttons on the fob. (*See id.* at 12-13.) In addition, each such command word "includ[es] a key portion derived at least in part from an encryption operation performed on [the] secret initial value." (JCI's Motion, Ex. 1, '181 Patent at 25:16-18.)

**B.      JCI's "HomeLink 2" Remote Garage Door Opener**

JCI's "HomeLink 2" product is a universal garage door opener that can be trained to send recognizable signals to many different brands of garage door openers.  Typically, the "HomeLink" transmitter is built into a vehicle's overhead console, mirror, or visor, and includes multiple buttons, each of which can be trained to communicate with a different garage door opener.

Lear accuses the "HomeLink 2" product of infringing the Koopman patents when the system operates in "Genie" mode, communicating with Genie brand receivers.  In "Genie" mode, a "HomeLink 2" transmission consists of a fixed serial number and an encrypted portion.  The encrypted part of the transmission, in turn, is formed from three values:  (i) a 16-bit counter value which increases by one with each press of a button; (ii) a 4-bit button code, indicating which of the multiple HomeLink buttons was pressed; and (iii) a 12-bit value referred to as a "discriminator," which, after decryption, is used by the receiver to authenticate a transmission.  The "HomeLink 2" transmitter uses the "Keeloq" algorithm for encryption and decryption.

### III.  ANALYSIS

**A.      The Standards Governing JCI's Motion**

Through its present motion, JCI seeks an award of summary judgment in its favor as to the issue of its "HomeLink 2" product's non-infringement of the Koopman patents.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply these standards in resolving JCI's motion for summary judgment regarding the Koopman patents.

**B.      JCI's "HomeLink 2" Product Does Not Infringe the Koopman Patents Because Its Transmissions Do Not Contain Command Words.**

In seeking a ruling as a matter of law that its "HomeLink 2" product does not infringe the Koopman patents, JCI has advanced five contentions, two of which apply equally to both of these patents, and the remaining three of which apply solely to either the '181 or the '752 patent. In support of one of its two broader challenges to Lear's claims of infringement, JCI begins with the undisputed observation that each of the independent claims asserted by Lear in this case — claims 23 and 71 of the '181 patent, and claims 26, 53, and 59 of the '752 patent — requires the transmitter to send a "command word" or, in the case of claim 53 of the '752 patent, a "command signal." JCI then asserts that these terms, properly construed, require the presence of "command bits" in a transmission. Because, in JCI's view, its "HomeLink 2" product does not transmit any such "command bits," it follows that this product does not infringe the Koopman patents. The Court agrees.

### 1.     The Law Governing the Court's Infringement Inquiry

This Court's infringement inquiry is governed by a two-step analytical framework. *See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315 (Fed. Cir. 1998); *Kahn v. General Motors Corp.,* 135 F.3d 1472, 1476 (Fed. Cir. 1998). First, the pertinent claims must be construed to determine their meaning and scope. *See Ethicon,* 149 F.3d at 1315. Next, the claims as construed must be compared to the accused device or system. *Ethicon,* 149 F.3d at 1315. To establish literal infringement, the plaintiff must demonstrate by a preponderance of the evidence "that every limitation in the claim is literally met by the accused device." *Kahn,* 135 F.3d at 1476.

Alternatively, under the doctrine of equivalents, the plaintiff may establish infringement by demonstrating that "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Kahn,* 135 F.3d at 1478 (internal quotation marks and citations omitted).

The first step of this inquiry, the construction of patent claims, is "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S. Ct. 1384, 1387 (1996). The principal focus of claim construction is the words of the claims themselves, as "the claims are of primary importance, in the effort to ascertain precisely what it is that is patented." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks and citation omitted). "[T]he words of a claim are generally given their ordinary and customary meaning" — that is, "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips,* 415 F.3d at 1312-13 (internal quotation marks and citations omitted).

The patent claims "do not stand alone," however, but "are part of a fully integrated written instrument" that also includes a specification. *Phillips,* 415 F.3d at 1315 (internal quotation marks and citation omitted). Thus, "claims must be read in view of the specification, of which they are a part," and the specification is "the single best guide to the meaning of a disputed term." 415 F.3d at 1315 (internal quotation marks and citation omitted). Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears,

but in the context of the entire patent, including the specification." 415 F.3d at 1313. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." 415 F.3d at 1316 (internal quotation marks and citation omitted).

Beyond the four corners of the written instrument, the Court also may consider "intrinsic evidence" — consisting of "the complete record of the proceedings before" the Patent and Trademark Office ("PTO"), including "the prior art cited during the examination of the patent" — and "extrinsic evidence" — which includes "expert and inventor testimony, dictionaries, and learned treatises." 415 F.3d at 1317 (internal quotation marks and citations omitted). Yet, the intrinsic evidence "is less useful for claim construction purposes" than the claim language itself, and the extrinsic evidence is still "less significant than the intrinsic record in determining the legally operative meaning of claim language." 415 F.3d at 1317 (internal quotation marks and citations omitted). With these standards in mind, the Court turns to the task of construing the pertinent claims of the Koopman patents.

**2. Each Asserted Claim of the Koopman Patents Requires the Transmission of a "Command Word" or "Command Signal" That Contains Command Bits.**

As noted, one of JCI's challenges to Lear's claims of patent infringement rests upon the premise that each asserted claim of the Koopman patents requires the transmission of a "command word" or "command signal." Indeed, this premise cannot be disputed, where each asserted claim expressly requires the transmission of a "command word" — or, in the case of claim 53 of the '752 patent, a "command signal" — that is received and authenticated or otherwise processed by a receiver. Thus, it is not necessary to stray beyond the language of the patent claims themselves to confirm this requirement of a "command word" or "command signal."

It is only a short step from this point to the next proposition advanced in JCI's motion — namely, that a "command word" or "command signal," as used in the Koopman patents, contains bits that specify a command to be performed, such as lock or unlock. Although the claims themselves do not define the precise content of a "command word" or "command signal," the patent specification states at more than one point that command bits are combined with other values to form the requisite "command word" or "command signal" that is sent to the receiver. (*See, e.g.,* JCI's Motion, Ex. 1, '181 Patent Abstract (referring to "command bits" that are "exclusive ORed into the low order bit positions" of the word to be transmitted); *id.* at 3:14; *id.* at 10:6-18; *id.* at 12:40-43; *id.* at 21:5-9.) As Lear recognizes, these passages in the patent specification are "highly relevant to the claim construction analysis," and provide "the single best guide to the

meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Sandisk Corp. v. Memorex Products, Inc.,* 415 F.3d 1278, 1285 (Fed. Cir. 2005) (instructing that "[t]he court must always read the claims in view of the full specification").

Lear's expert, Dr. Rubin, also has interpreted the "command word" and "command signal" terms of the Koopman patents as requiring the presence of command bits. In his initial expert report on infringement, Dr. Rubin observes that in the preferred embodiment of the '181 patent, five command bits are combined with other values to form the command word to be transmitted, with each command assigned its own distinct string of command bits. (JCI's Motion, Ex. 4, Rubin Report at 12-13.) Dr. Rubin then elaborates on this point in his rebuttal report, explaining why, in his view, one of the asserted claims of the '181 patent is not anticipated by the "Keller" patent:

> I also note that Keller's transmission does not contain a "command word" as used in the ['181] patent claims. No particular bits of Keller's transmission . . . expressly contain a command. Note that "command word" is more explicit than a transmission that merely indicates a command. "Command word" requires command bits, whereas a transmission "indicative of" a command does not necessarily require reserved bits.

(JCI's Motion, Ex. 16, Rubin Rebuttal Report at 6.) Accordingly, the record uniformly demonstrates — and Lear does not dispute — that the "command word" or "command signal" that is transmitted under the asserted claims of the Koopman patents includes command bits.

> **3.** **Because the "HomeLink 2" Product Does Not Transmit Command Bits, It Does Not Infringe the Koopman Patents.**

Having construed the relevant terms of the asserted claims of the Koopman patents, the Court now turns to the second step of its infringement inquiry — namely, a comparison between the claims as construed and the accused "HomeLink 2" product. JCI argues that under the parties' shared and undisputed understanding of the operation of the "HomeLink 2" product, this product does not transmit command bits, and therefore does not infringe the Koopman patents. The Court agrees.

As noted above, Lear does not dispute JCI's contention that each asserted claim of the Koopman patents requires the transmission of a "command word" or "command signal" that consists in part of command bits. Nonetheless, Lear insists that issues of fact remain as to whether the transmissions made by JCI's "HomeLink 2" product include the requisite command bits. In particular, Lear contends that the 4-bit "button code" contained in each "HomeLink 2" transmission — a code which, as observed earlier, indicates which of the multiple HomeLink buttons was pressed — supplies the command bits that make each such transmission a "command word" or "command signal" within the meaning of the Koopman patents.

The parties agree as to the purpose served by the "button code" bits in a "HomeLink 2" transmission. As acknowledged by Lear's expert, Dr. Rubin, the button code serves to distinguish among the several buttons on a typical "HomeLink 2" transmitter, each of which can be trained to communicate with a different receiver (*i.e.,* garage door opener). (*See* Lear's Response, Ex. D, Rubin Dep. at 226.) Thus, as Dr. Rubin explained at his deposition, the "button code" portion of a "HomeLink 2"

transmission serves to ensure that "the right receiver . . . will know" that it is the intended recipient of a given transmission. (*Id.* at 226.) If so, the recipient garage door opener "changes state" — that is, it proceeds to the next step in the usual garage door sequence (open, stop, or close). (*Id.* at 222.)

In JCI's view, the "HomeLink 2" button code cannot properly be viewed as a command, but rather is more accurately described as a "name tag" that identifies the source of the transmission. (JCI's Motion, Br. in Support at 13.) In contrast to the command bits transmitted under the asserted claims of the Koopman patents, which tell the receiver which of a number of commands (*e.g.,* lock or unlock) to perform, the "button code" portion of a "HomeLink 2" transmission does not cause the receiving garage door opener to select from a number of different functions. Rather, it is used simply to confirm that a given transmission originated through the press of a specified button on the "HomeLink 2" transmitter, and hence was meant for a given receiver corresponding to this specified button. If the button code indicates the press of a button that has been trained to communicate with a particular receiver, this receiver will acknowledge the transmission by changing the state of the garage door — namely, by opening a closed door, closing an open door, or stopping a door in motion. Because the button code is not used to distinguish or select among a number of different functions or commands that the recipient receiver can be requested to perform, JCI argues that it cannot meet the "command word" or "command signal" element set forth in each of the asserted claims of the Koopman patents.

13

Lear offers two responses on this point, one based on the '181 patent specification and the other resting upon the testimony of Dr. Rubin. First, Lear cites a passage from the '181 patent specification that, in its view, broadly defines a "command" as encompassing the function served by the "HomeLink 2" button code:

> Although the present invention employs only lock-related commands, the panic alarm command, and synchronization commands, it should be understood that the invention can be utilized to authenticate conveyance of any information in the form of bits similar to the command bits herein. Thus, in its broadest sense, the term "lock-related command" means the conveying of other than a synchronization command, the conveyance of which is to be authenticated; this may then be thought of as a command apart from the internal functioning of the system itself.

(JCI's Motion, Ex. 1, '181 Patent at 21:5-14.) Similarly, Lear reads another portion of the specification as indicating that a transmission qualifies as a "command" so long as it brings about the performance of a task as a result of a button press:

> The command to perform a certain task, such as a lock-related command (lock or unlock the doors, release the trunk), or to operate the lights and the horn or other alarm on the automobile in the event of a panic situation, or to cause cryptographic synchronization or resynchronization between the transmitter and the receiver module in the automobile, are under control of a plurality of buttons 12-15 disposed on a keychain fob or other hand-held transmitter unit shown in FIG. 1.

(*Id.* at 4:42:50.) Lear maintains that "HomeLink 2" transmissions satisfy this definition of a command by actuating (*i.e.,* opening or closing) a garage door "under the control of specific button pushes." (Lear's Response Br. at 10.)

Neither of these passages from the '181 patent specification raises a genuine issue of fact as to "HomeLink 2"'s infringement of the Koopman patents. Under Lear's

14

proposed reading of the first of these passages, the requirement of "command bits" may be satisfied by "the conveyance of any information in the form of bits," so long as this "conveyance" is then "authenticated" by the receiver. And, to be sure, the "HomeLink 2" button code qualifies as "information" conveyed "in the form of bits" in a transmission, which then is authenticated by the receiver to determine whether this transmission came from a source to which the receiver should respond. Yet, any such claim construction that would require only the transmission of "information" seemingly would disregard a limitation expressly set forth in the claims themselves — namely, that each transmission consists of a "command word" or "command signal." While a "command" surely is a form of "information," it is more narrowly defined in the dictionary as "an order given" or "a word or phrase especially in a set form by which an order is given." Webster's Third New International Dictionary, Unabridged (2002).[2]

It is true that, under the rules governing claim construction, a patentee is permitted to "act[] as his own lexicographer," using the patent specification to "set forth a definition for [a claim] term different from its ordinary and customary meaning." *International Rectifier Corp. v. IXYS Corp.,* 361 F.3d 1363, 1370 (Fed. Cir. 2004). Yet, this Court simply is unable to read the above-quoted passage from the '181 patent specification as evidencing the inventor's intent to broadly equate the terms "command" and

---

[2]Another dictionary provides a more technical definition, from the field of computer science, stating that a "command" is a "signal that initiates an operation defined by an instruction." American Heritage College Dictionary (3d ed. 1993).

"information." To the contrary, this passage closes with the statement that a "lock-related command" may properly be "thought of as *a command* apart from the internal functioning of the system itself." (JCI's Motion, Ex. 1, '181 Patent at 21:13-14 (emphasis added).) The evident point of this passage, then, is that a "command" within the meaning of the '181 patent is not limited to "lock-related" commands of the sort typically transmitted in an automobile RKE system. This does not establish the further proposition advanced by Lear — that, when construing the asserted claims of the Koopman patents, the terms "command word" and "command signal" should be broadly interpreted as encompassing the transmission of any information whatsoever, even if it would not qualify as a "command" under the ordinary understanding of that term. Neither has Lear suggested any other basis for treating the terms "command" and "information" synonymously in construing the asserted claims of the Koopman patents. Accordingly, this passage provides no assistance to Lear in establishing that the "HomeLink 2" product infringes the Koopman patents.

The second passage cited by Lear is equally unavailing. Contrary to Lear's contention, this passage cannot fairly be read as broadly defining the term "command" to encompass any transmission brought about by a button push that results in some task being performed. Rather, the clear import of this passage is that, by pushing one or more of a plurality of buttons on a key fob or other hand-held transmitter, the user controls which of a number of available "command[s] to perform a certain task" will be transmitted to the receiver. The transmission, then, serves to inform the receiver what

task the user wishes it to perform.  In contrast, and as JCI correctly observes, the button code transmitted by the "HomeLink 2" product "does not command the garage door to do anything," (JCI's Motion, Br. in Support at 12), much less identify which of a number of tasks the receiver is to perform.

To be sure, this passage — perhaps by itself, and even more clearly when read in combination with the one discussed earlier — lends support to Lear's contention that a "command" need not be narrowly limited to "automotive RKE functions like lock/unlock a car door."  (Lear's Response Br. at 9.)  Yet, as the undisputed record makes clear, the "HomeLink 2" button code simply does not operate like a command — it does not, as described in this passage, direct the receiving device "to perform a certain task," whether an automotive RKE function or otherwise.  Instead, and as Lear's own expert has testified, the button code serves to identify the source of the transmission, so that the receiver may ascertain that it is the intended recipient of this transmission.  Consequently, nothing in the cited portions of the specification expands the term "command" so far beyond its ordinary usage that it would reach the identifying, "name tag" purpose served by the "HomeLink 2" button code.

Next, Lear cites an excerpt from the deposition testimony of its expert, Dr. Rubin, as giving rise to issues of fact as to whether the "HomeLink 2" button code qualifies as "command bits" within the meaning of the Koopman patents.  In this cited excerpt, Dr. Rubin testified:

Q:     Does the button [code] tell you what the command is?

A:     It — it tells — it tells the receiver what the command is, it doesn't tell me.

Q:     What are the possible commands that you can program HomeLink to be?

A:     I suppose actuate.

* * * *

Q:     So, actuate means what, do whatever is next to do?

A:     Whatever is assigned to this button.

Q:     Every time you push it, it's going to be the same command; is that fair to say?

A:     I believe so, yes.

Q:     So the command, which button, which bits would you consider to be the command bits in the HomeLink transmission?

A:     The button code.

* * * *

Q:     And those button codes serve to distinguish between the different buttons?

A:     Right.

Q:     Right?

A:     So the right receiver will — will know that it — that it's the one it's speaking to.

Q:     The button code doesn't contain an explicit command, does it?

A:     Everything in — in binary is encoded to represent some action that's stored on both sides.

Q: So?

A: So — so it's always implicit when you send codes, and it's up to interpretation when processing once it's received, and it has to be decided to figure out what to do.

(Lear's Response, Ex. D, Rubin Dep. at 225-27.) Lear argues that Dr. Rubin's testimony on this point "has a solid foundation" and "must be accepted as true" for present purposes, (Lear's Response Br. at 9), thereby raising a triable issue of fact as to whether "HomeLink 2" transmissions qualify as "command words" or "command signals" within the meaning of the Koopman patents.

The Court cannot agree. As Lear implicitly acknowledges, and as the Federal Rules of Evidence confirm, Dr. Rubin's expert testimony on a particular subject may be admitted — and, thus, may give rise to a genuine issue of fact — only if it is based on "reliable principles and methods" that have been applied "reliably to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591, 113 S. Ct. 2786, 2795-96 (1993) (requiring that there be a "fit" between the expert's testimony and the facts of the case, such that the testimony will aid the trier of fact in resolving a relevant factual issue). While Dr. Rubin presumably possesses specialized knowledge about the inventions described in the Koopman patents and the operation of the "HomeLink 2" product, any comparisons he might offer between the two must rest upon accurate characterizations of the patented inventions and JCI's product. As the Supreme Court has emphasized, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997). Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric,* 522 U.S. at 146, 118 S. Ct. at 519.

So it is here. In opining that the button code in a "HomeLink 2" transmission qualifies as the "command bits" required under the asserted claims of the Koopman patents, Dr. Rubin reasoned that the button code serves the function of command bits because the receiver decodes the button code "to figure out what to do." (Lear's Response, Ex. D, Rubin Dep. at 227.) Yet, under the undisputed record bearing upon the operation of the "HomeLink 2" product, the "HomeLink 2" receiver ***does not*** decode a transmission in order to "figure out what to do," nor does the button code "represent some action" that the receiver is to perform. Rather, the receiver looks to the button code to determine the identity of the source of the transmission, in order to ascertain whether it is the intended recipient of this transmission. Against this backdrop, Lear has not identified any "specialized knowledge" Dr. Rubin might possess, *see* Fed. R. Evid. 702, that would permit the conclusion that the "HomeLink 2" button code functions as a "command" within the meaning of the Koopman patents. Rather, Dr. Rubin has merely asserted as *ipse dixit* that it does, without establishing the requisite "fit" between his proffered analysis and the undisputed record. Accordingly, the testimony of Lear's expert does not give rise to an issue of fact as to "HomeLink 2"'s literal infringement of the Koopman

patents.[3]

This leaves only the possibility that JCI's "HomeLink 2" product might be found to infringe the Koopman patents under the doctrine of equivalents. Yet, Lear has failed to raise any such contention in its response to JCI's motion — that is, it has not identified any equivalence between some portion of a "HomeLink 2" transmission and the "command word" or "command signal" element that is a part of each of the asserted claims of the Koopman patents — and the Court declines to fashion such an argument on its behalf. In any event, Lear has not identified any expert testimony or "particularized evidence" in support of an appeal to the doctrine of equivalents, at least as to this aspect of its claims of infringement, and any "conclusory statements" it might offer on this point "do not raise any genuine issues of material fact" that could defeat JCI's entitlement to summary judgment. *PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364 (Fed. Cir. 2005). Accordingly, because the accused "HomeLink 2" product does not, as a matter of law, include one of the elements found in each of the independent claims asserted by Lear in this case — namely, the transmission of a "command word" or

---

[3]In its response to JCI's summary judgment motion, Lear points out that once a court has construed a patent claim, it must generally be left for the trier of fact to "determin[e] whether the construed claim reads on the accused product." *PPG Industries v. Guardian Industries Corp.,* 156 F.3d 1351, 1355 (Fed. Cir. 1998). As the Federal Circuit has recognized, however, this latter question is "amenable to summary judgment" where "the parties do not dispute any relevant facts regarding the accused product." *General Mills, Inc. v. Hunt-Wesson, Inc.,* 103 F.3d 978, 983 (Fed. Cir. 1997); *see also International Rectifier Corp.,* 361 F.3d at 1375 (granting summary judgment in the defendant's favor as to certain of the plaintiff's claims of infringement where the "undisputed evidence" showed that the accused product did not include one of the limitations of the asserted claims). This principle is fully applicable here because, as explained above, there is no genuine dispute as to the relevant aspects of JCI's "HomeLink 2" product.

"command signal" — JCI is entitled to summary judgment in its favor on Lear's claims of infringement of the Koopman patents.  *See Monsanto Co. v. Syngenta Seeds, Inc.,* 503 F.3d 1352, 1359 (Fed. Cir. 2007) (confirming that a defendant "who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim" (internal quotation marks and citation omitted)).[4]

---

[4]In light of the Court's conclusion that the "HomeLink 2" product does not transmit a "command word" or "command signal" within the meaning of the Koopman patents, it need not reach the remaining arguments advanced by JCI in support of its summary judgment motion.

# IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for

summary judgment regarding the Koopman patents (docket #95) is GRANTED, in

accordance with the rulings in this opinion and order.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 11, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 11, 2010, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager