**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LEAR AUTOMOTIVE DEARBORN, INC.
and LEAR CORPORATION,

    Plaintiffs,                                     Case No. 04-73461
                                                       Hon. Gerald E. Rosen

v.

JOHNSON CONTROLS, INC. and
JOHNSON CONTROLS INTERIORS LLC,

    Defendants.
_____/

**OPINION AND ORDER REGARDING
REMAINING TWO MOTIONS *IN LIMINE***

        At a session of said Court, held in
       the U.S. Courthouse, Detroit, Michigan
      on        January 20, 2011       

        PRESENT:  Honorable Gerald E. Rosen
                                Chief Judge, United States District Court

        In an opinion and order dated October 18, 2010, the Court resolved a number of motions *in limine* filed by the parties, but took two remaining motions under advisement. The present opinion sets forth the Court's rulings on these remaining motions, one filed by Plaintiffs Lear Automotive Dearborn, Inc. and Lear Corporation (collectively "Lear"), and the other filed by Defendants Johnson Controls, Inc. and Johnson Controls Interiors LLC (collectively "JCI").

**I.      Lear's Motion *in Limine* #5 To Preclude Reference to Economic Damage Models Unrelated to the Facts of the Case**

In its final pending motion *in limine,* Lear seeks to exclude a portion of the testimony of JCI's damages expert, Brian Blonder, on the ground that it purportedly is inconsistent with the Court's construction of claim 4 of U.S. Patent No. 5,731,756 (the "Roddy patent").[1] In Lear's view, this Court held in its initial summary judgment ruling that claim 4 encompasses transmitters that are merely ***capable*** of controlling a plurality of systems, and not just transmitters that actually are programmed by the user to control a plurality of systems. Yet, in his opinion on damages, Mr. Blonder posits that claim 4 of the Roddy patent can only be infringed when at least two buttons of a transmitter are ***actually used***, one to activate a fixed-code system and the other to activate a rolling-code system. Lear argues that this narrow interpretation of claim 4 is at odds with the Court's ruling and the language of the claim itself, and that the damages model offered by Mr. Blonder in reliance on this interpretation should be excluded as unsupported.

As JCI points out in response, Lear has misconstrued the Court's November 2, 2007 summary judgment ruling as resolving an issue of claim construction that the Court had no occasion to reach. In determining whether claim 4 of the Roddy patent was anticipated by the Dykema patent, the Court addressed Lear's argument that the Dykema

---

[1] In its November 2, 2007 summary judgment ruling, the Court held that claims 1 and 4 of the Roddy patent were anticipated by U.S. Patent No. 5,661,804 (the "Dykema patent"). Consequently, claim 4 of the Roddy patent is no longer at issue. Nonetheless, this claim is incorporated into claims 5, 6, and 7 of the Roddy patent, and these latter claims form the basis for Lear's remaining claims of infringement. It follows that the proper construction of claim 4 remains relevant to Lear's outstanding claims.

patent "fail[ed] to disclose a multiple-button transmitter that transmits a ***combination*** of fixed and rolling codes," but instead disclosed a transmitter in which each button "must transmit precisely the same type of code — *i.e.,* either all fixed or all rolling codes, but not a combination of the two." (11/2/2007 Op. at 47.) In rejecting this reading of the Dykema patent, the Court relied in part on a passage from the Dykema patent stating that its transceiver must be "capable of learning and subsequently transmitting an activation signal to a receiver utilizing a cryptographic algorithm." (*Id.* at 50 (quoting Dykema Patent at 4:51-53).) Yet, in reaching this conclusion, it was utterly unnecessary for the Court to decide whether the Dykema patent — much less claim 4 of the Roddy patent — disclosed a multi-button transceiver with one button used to activate a fixed-code system and another used to activate a rolling-code system, or whether it was enough that the transceiver disclosed in the Dykema patent was merely "capable" of transmitting both fixed and rolling codes by training two separate buttons for these purposes. Contrary to Lear's contention, then, the Court's summary judgment opinion simply did not address the issue of claim construction raised in Lear's present motion, and this issue cannot be resolved by wrenching snippets of this ruling from their surrounding context.

      Upon turning to this issue, the Court readily concludes that JCI has put forward the better reading of claim 4 of the Roddy patent. This claim builds upon claim 1, which discloses a "method of actuating at least one home security system remotely." (Roddy Patent at 6:8-9.) Claim 4 then discloses a "method as recited in claim 1, wherein there are a plurality of systems controlled by signals sent by said transmitter, and at least one of

3

said systems receiving a non-encrypted signal from said transmitter." (*Id.* at 6:31-34.) Finally, claims 5 and 6 — two of the three claims that remain at issue — add the element that one member of this "plurality of systems" must be "provided with an add-on receiver having encryption logic," (*id.* at 6:36-37), while claim 7 — the third claim that remains at issue — discloses that this system with the add-on receiver is a garage door opener, (*id.* at 6:44).

Under its plain language, then, claim 4 discloses a method for controlling "a plurality of systems" through signals sent by the transmitter described in claim 1, with at least one of these systems controlled by non-encrypted signals. Claims 5 and 6 add the requirement that another of the "plurality of systems" must feature an add-on receiver with encryption logic. Because the Roddy patent is a method patent, it is infringed only by devices that perform ***all*** of the claimed steps of the method. *See EMI Group North America, Inc. v. Intel Corp.,* 157 F.3d 887, 896 (Fed. Cir. 1998). Thus, an infringing device must actuate a plurality of — *i.e.,* two or more — home security systems, with one of these systems (per claim 4) actuated by non-encrypted signals, and another of these systems (per claims 5 and 6) actuated through the use of an add-on receiver with encryption logic.

In the portion of his expert report challenged by Lear, Mr. Blonder cites surveys indicating that many users of JCI's "HomeLink" product program only one of its multiple buttons, and he opines that "there was no potential for this 1 button use to induce infringement of the [Roddy] patent, because inducing infringement of the Roddy patent[]

4

required the use of, at a minimum, two different buttons." (Lear's Motion, Ex. A, Blonder Expert Report at 36-37.) In Lear's view, however, JCI's multi-button HomeLink product induces infringement of claims 5 through 7 of the Roddy patent even when only one button is programmed, because the product's other buttons remain *capable* of being trained to control additional systems. Yet, this notion of "capability" is not found anywhere in the language of the relevant claims. Rather, the claims disclose a method of actuating a plurality of home security systems, at least one of which receives non-encrypted signals, and at least one of which incorporates an add-on receiver with encryption logic. As explained above, a device does not infringe unless it performs *all* of these claimed steps of the patented method. It follows that the challenged portions of Mr. Blonder's expert report are consistent with the proper construction of claims 4 through 7 of the Roddy patent, and need not be excluded.[2]

---

[2] For what it is worth, it is not evident to the Court that the exclusion of this aspect of Mr. Blonder's damages analysis would significantly alter the landscape upon which Lear's claim of damages will be evaluated at the forthcoming trial. Accepting Mr. Blonder's report on this point, the universe of infringing HomeLink consumers is limited to those who have programmed at least two of the product's buttons. Yet, all apparently are agreed that this universe of infringing consumers is further limited to those who made use of an add-on receiver or "box on the wall" to enable their HomeLink units to actuate their garage door opener systems. As discussed below, the record evidently shows that JCI distributed only about 570 add-on receivers during the relevant time period, out of roughly 28.7 million HomeLink units sold during this period. Surely, then, this is (by far) the most significant limiting factor in determining the universe of infringing consumers, regardless of whether one further limits this (very small) universe to those consumers who made use of an add-on receiver *and* programmed multiple buttons on their HomeLink units. Certainly, Lear's theory of damages does not turn on this modest distinction, but instead rests upon a "hypothetical negotiation" analysis (discussed below) that seeks to bring JCI's entire base of 28.7 million HomeLink units into play in calculating a reasonable royalty owed by JCI to Lear.

## II. JCI's Motion to Strike the Testimony and Reports of Lear Expert Joseph Gemini

In the final motion *in limine* that remains pending before the Court, JCI seeks to exclude the testimony of Lear's damages expert, Joseph Gemini, on the ground that this testimony does not meet the requirements for admissibility under Fed. R. Evid. 702. In the testimony at issue, Mr. Gemini opines that Lear is entitled to a reasonable royalty derived from the entirety of JCI's sales of 28.7 million HomeLink units during the relevant period for computing damages. JCI, in contrast, contends that in light of the Court's rulings, resulting in only dependent claims 5, 6, and 7 of the Roddy patent remaining at issue, Lear's claim for damages must necessarily be limited to a royalty base consisting of the 570 add-on receivers distributed by JCI during this period.

In essence, the disposition of JCI's motion turns upon whether Lear and its damages expert have advanced a plausible theory that satisfies the criteria of Rule 702 and the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993). Under the Patent Act, once Lear establishes infringement, it is entitled to an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. In addition, the Court is authorized to "receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." 35 U.S.C. § 284. In this case, Lear's expert, Mr. Gemini, has adopted the widely accepted "hypothetical negotiation" approach

to computing a reasonable royalty, under which he has "attempt[ed] to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009). As an aid to determining the amount of a reasonable royalty, Mr. Gemini has looked to the non-exhaustive list of fifteen factors articulated in *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp.1116, 1120 (S.D.N.Y. 1970), an approach approved by the Federal Circuit in a number of cases, *see, e.g., Lucent Technologies,* 580 F.3d at 1324-35; *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1385-86 (Fed. Cir. 2001).

In computing a reasonable royalty to which the parties would have agreed in a "hypothetical negotiation" just before the alleged infringement began, Mr. Gemini starts with the premise that JCI deemed it extremely important to its customer base of automobile manufacturers that its HomeLink product achieve 100 percent compatibility with all existing and anticipated garage door openers.[3] JCI was able to achieve much of this desired compatibility through license agreements with various garage door opener ("GDO") manufacturers, such as Chamberlain, Genie, and Stanley, under which JCI paid a per-unit fee to these manufacturers so that each GDO maker's algorithm could be loaded into each HomeLink unit. Yet, under Mr. Gemini's view of the record, these

---

[3]JCI disputes Lear's reading of the record as establishing the automakers' demand for 100 percent compatibility, but Mr. Gemini's view of this record is accepted as accurate for present purposes.

7

license agreements were expected to achieve only a compatibility rate between 89 and 95 percent, leaving a 5-to-11 percent "compatibility gap" to be closed by the patented add-on receiver or "box on the wall" that could actuate any remaining GDOs that the HomeLink product itself could not control. This record indicates, then, that JCI was willing to pay an across-the-board, per-unit licensing fee to the various GDO manufacturers, even though (i) a particular HomeLink consumer might not own a GDO made by a given manufacturer, and thus would not need or use the algorithm loaded into his or her HomeLink unit for this manufacturer's GDO, and (ii) these various license agreements, taken together, did not achieve the desired 100 percent compatibility, but only allowed JCI to get approximately 89 to 95 percent of the way to this goal. From this record, Mr. Gemini surmises that JCI would have been willing, in a "hypothetical negotiation," to pay Lear an across-the-board, per-unit licensing fee which, like JCI's licensing arrangements with the various GDO makers, (i) would have covered all HomeLink units, even those that had no need for the particular add-on receiver or "box on the wall" that Lear could supply, and (ii) would not, by itself, have delivered the 100 percent compatibility sought by JCI, but merely contributed to this goal.

  JCI challenges this expert analysis on two principal grounds. First, it contends that Mr. Gemini has improperly employed an "entire market value" analysis under circumstances where this rule does not apply. As the Federal Circuit has explained, "[f]or the entire market rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand." *Lucent Technologies,* 580 F.3d at 1336 (internal

8

quotation marks and citations omitted). As noted earlier, the record in this case indicates that out of 28.7 million HomeLink units sold during the relevant period, JCI distributed only 570 add-on receivers. This suggests that less than 0.002 percent of HomeLink users needed an add-on receiver or "box on the wall" in order to ensure compatibility with their GDO systems. Under this record, and in the absence of any other evidence that an add-on receiver might have formed "the basis for consumer demand" for JCI's HomeLink product, JCI contends that Mr. Gemini's purported reliance on the "entire market value" rule is misplaced and cannot supply the basis for an award of damages here. *See IP Innovation L.L.C. v. Red Hat, Inc.,* 705 F. Supp.2d 687, 689-90 (E.D. Tex. 2010) (granting a motion to strike an expert report prepared by Mr. Gemini in which he invoked the "entire market value" rule, and citing the lack of evidence that the claimed invention "contribut[ed] to the demand for the entire product asserted as the royalty base").

  The Court agrees with Lear, however, that Mr. Gemini's analysis in this case does not rely upon the "entire market value" rule, but rather employs the traditional *Georgia-Pacific* factors in a manner which merely implicates some of the same principles underlying this rule. In particular, one of the *Georgia-Pacific* factors is the "effect of selling the patented specialty in promoting sales of other products of the licensee." *Georgia-Pacific,* 318 F. Supp. at 1120; *see also Interactive Pictures,* 274 F.3d at 1385. As Lear explains, this factor "takes into account th[e] 'commercial magnetism'" through which a patented item might drive demand for the accused product, (Lear's Response Br. at 13), just as the "entire market value" rule allows the patentee to recover damages based

9

upon the entire value of the accused product so long as the patent-related feature constitutes the basis for customer demand for the accused product, *see Lucent Technologies,* 580 F.3d at 1336. Although these two analytical approaches share a common principle — namely, that a reasonable royalty should account for the extent to which a patented item increases the demand for or value of the accused product — Lear and its expert need not meet each of the formal, rigid prerequisites to the "entire market value" rule in order to employ this shared principle. Rather, the Federal Circuit has observed that "even when the patented invention is a small component of a much larger commercial product, awarding a reasonable royalty based on . . . number of units sold can be economically justified," so long as the per-unit royalty *rate* is set at an amount that appropriately reflects the contribution of the patented invention to the demand for the accused product. *Lucent Technologies,* 580 F.3d at 1338-39. In this case, Mr. Gemini has selected a royalty rate that is intended to reflect the modest 5-to-11 percent "compatibility gap" that the patented device was expected to close.[4] Thus, his analysis is not defeated by its reliance on principles that also feature in the "entire market value" rule, nor does his reliance on these principles dictate that he satisfy all of the prerequisites for application of the "entire market value" rule.

Next, JCI contends that Mr. Gemini has engaged in an impermissible and

---

[4]As explained in Lear's response to JCI's motion, "[i]f $1.19 is the royalty [paid to GDO makers] on all HomeLink products to achieve between 89% and 95% compatibility, then a *pro rata* share of that $1.19 is the proper calculation [of a royalty rate] for the remaining 5% to 11% that is attributable to Lear." (Lear's Response Br. at 14.) Based on this reasoning, Mr. Gemini has arrived at a royalty rate of between six and fifteen cents per HomeLink unit.

unsupported "apples to oranges" comparison by looking to JCI's license agreements with the various GDO manufacturers as a model for the royalty JCI would have agreed to pay to Lear in a "hypothetical negotiation" for the right to distribute the patented add-on receiver. As JCI observes, the features it secured through the license agreements with the GDO makers differ in one fundamental respect from the add-on receiver that would have been the subject of its "hypothetical negotiation" with Lear. In the former transactions, JCI secured the right to load each GDO manufacturer's algorithm into its HomeLink units, so that the units would function properly no matter which GDO a particular car buyer might own or plan to obtain. Its "hypothetical negotiation" with Lear, in contrast, need only have addressed situations where a HomeLink purchaser simply could not get the unit to function with his or her GDO, and thus had to contact the car dealer or JCI to obtain an add-on receiver that would address this compatibility issue. Under these latter circumstances, there seemingly would have been no need for JCI to anticipate the degree of non-compatibility by negotiating an up-front, across-the-board agreement that would have allowed JCI to distribute add-on receivers to any HomeLink customers who might need one — rather, JCI presumably could have simply addressed each instance of non-compatibility as it arose on a case-by-case basis, paying a royalty for each such add-on receiver it actually shipped to a customer.

   Although the question is a close one, the Court believes that this challenge to Mr. Gemini's damage analysis goes to the weight, and not the admissibility, of his proposed testimony. To be sure, JCI has identified reasons for a trier of fact to reject Mr. Gemini's

reliance upon JCI's license agreements with the GDO manufacturers as a model for computing a reasonable royalty owed to Lear. Nonetheless, Mr. Gemini's approach is not wholly speculative, but rather rests upon JCI's actual negotiations and agreements with GDO makers who, like Lear, could supply a product or feature that would assist JCI in satisfying the purported 100 percent compatibility demands of the automobile manufacturers. With the benefit of hindsight, of course, it evidently has turned out that the "compatibility gap" closed by the patented add-on receivers has been exceedingly small, representing less than 0.002 percent of JCI's total sales of 28.7 million HomeLink units. Yet, Lear points to evidence that, at the time of the "hypothetical negotiation" in the late 1990s, JCI believed it would achieve a compatibility rate of between 89 and 95 percent through its license agreements with the GDO makers. In light of this perceived "compatibility gap" of between 5 and 11 percent, the Court cannot say that it is altogether implausible and wholly unreliable for Mr. Gemini to opine that a "hypothetical negotiation" between JCI and Lear at the time might have produced an across-the-board, per-unit license agreement akin to those JCI had entered into with the GDO makers. Instead, it should be left to the trier of fact to decide whether to accept or reject this comparison.[5]

## III.   Conclusion

---

[5]Needless to say, the proofs at trial often differ from the more limited record presented by the parties in connection with a pretrial motion *in limine*. Accordingly, the Court reserves the right to revisit the matters raised in JCI's motion after it hears the entirety of Mr. Gemini's testimony at trial.

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' motion *in limine* #5 to preclude reference to economic damage models unrelated to the facts of the case (docket #155) is DENIED. IT IS FURTHER ORDERED that Defendants' motion to strike the testimony and expert witness reports of Plaintiffs' expert Joseph Gemini (docket #146) also is DENIED.

                              s/Gerald E. Rosen
                              Chief Judge, United States District Court

Dated: January 20, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 20, 2011, by electronic and/or ordinary mail.

                              s/Ruth A. Gunther
                              Case Manager