**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LEAR AUTOMOTIVE DEARBORN, INC.
and LEAR CORPORATION,

       Plaintiffs,                                  Case No. 04-73461
                                                 Hon. Gerald E. Rosen

v.

JOHNSON CONTROLS, INC. and
JOHNSON CONTROLS INTERIORS LLC,

       Defendants.
_____/

**OPINION AND ORDER REGARDING**
**ADMISSIBILITY OF SURVEY EVIDENCE**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     February 7, 2011    

PRESENT:  Honorable Gerald E. Rosen
                      Chief Judge, United States District Court

On January 25, 2011, the parties proceeded to trial on claims of patent

infringement asserted by Plaintiffs Lear Automotive Dearborn, Inc. and Lear Corporation

(collectively "Lear") against Defendants Johnson Controls, Inc. and Johnson Controls

Interiors LLC (collectively "JCI").  In the course of this trial, Lear has sought to introduce

and rely upon the results of surveys taken at JCI's direction in which consumers have

been asked to describe the use they have made of JCI's HomeLink product.  JCI, in turn,

has objected that the purpose for which Lear seeks to offer this survey data — *i.e.,* for the

truth of the representations of customers as to how they have used HomeLink — renders

it  inadmissible hearsay.

The parties were invited to submit briefs on this issue, and each side has done so.[1] Having reviewed the parties' submissions and examined the pertinent case law, the Court finds, for the reasons stated below, that the survey responses at issue qualify as so-called "adoptive admissions" under Fed. R. Evid. 801(d)(2)(B).

## I.  FACTUAL BACKGROUND

As a result of the Court's pretrial rulings, Lear acknowledges that it must prove "that of the (at least) 660 fix kit owners, at least one also uses HomeLink to control a non-encrypted system."  (Lear's Trial Br. at 1.)[2]  As part of this required showing, Lear seeks to introduce evidence of the percentage of HomeLink users who have programmed two or more buttons on their HomeLink units.  In Lear's view, this evidence of fairly widespread multiple-button use, when combined with other evidence in the record, will permit the trier of fact to conclude that JCI's HomeLink product has been used in a manner that

---

[1]Given the importance of the question whether the survey data is admissible for the purpose for which Lear seeks to offer it, it is a matter of no small curiosity to the Court why neither party thought to raise this interesting and challenging evidentiary issue in a pretrial motion *in limine,* but instead thought it appropriate to leave it for the Court to resolve this issue on the fly at trial.  Certainly, the parties were not reticent in bringing myriad other matters before the Court through pretrial motions *in limine,* a number of which involved issues of considerably less import than the question presented here.  The Court can only hope that the failure to raise this issue earlier, so that the Court would have greater time and opportunity to consider and reflect upon it, was the product of oversight and not strategic or tactical calculation.

[2]The term "fix kit" has been used by the parties to refer to the "add-on receiver" that is an element of each of the patent claims that Lear accuses JCI of infringing — namely, claims 5, 6, and 7 of U.S. Patent No. 5,731,756 (the "Roddy patent").

infringes claims 5 through 7 of the Roddy patent.[3]

Yet, Lear faces a threshold obstacle in establishing the number or percentage of HomeLink users who have programmed two or more buttons on their HomeLink units. Simply put, there is no direct evidence in the record as to how any specific consumer has used the HomeLink product, much less that any HomeLink unit has actually been used in a manner that would infringe claims 5 through 7 of the Roddy patent. Rather, Lear seeks to prove these propositions circumstantially, based in part upon surveys conducted at JCI's direction in which customers have been asked to describe their use of the HomeLink system. These surveys, generally speaking, indicate that roughly 30 percent of the individuals surveyed reported that they had programmed two or more buttons on their HomeLink units. This survey data raises obvious hearsay concerns, however, as it rests upon the out-of-court accounts of HomeLink customers who have not been called as witnesses at trial. Accordingly, the Court now turns to this evidentiary issue.

## II.  ANALYSIS

### A.    The Standards Governing the Admissibility of the Survey Data Propounded by Lear

Under Fed. R. Evid. 802, hearsay is presumptively not admissible. Moreover, the survey data at issue here falls within the definition of "hearsay" set forth in Fed. R. Evid.

---

[3]In the present opinion, the Court addresses only the admissibility of the survey data upon which Lear seeks to rely in establishing multiple-button use by HomeLink consumers. The Court expresses no view here as to whether this data, if admissible and viewed in combination with the other evidence offered by Lear at trial, would suffice to permit the trier of fact to hold JCI liable for infringement of claims 5 through 7 of the Roddy patent.

801(c), as it consists of out-of-court statements by HomeLink customers that Lear seeks to introduce for the truth of the matter asserted in these statements — namely, to establish that at least some of these customers programmed two or more buttons on their HomeLink units.[4]  Consequently, the survey data is admissible only if it qualifies as non-hearsay under Fed. R. Evid. 801(d), or if it fits within a recognized hearsay exception.  In its brief addressing this data, Lear pursues each of these avenues of admissibility, arguing (i) that the data is admissible under the residual exception set forth in Fed. R. Evid. 807, and (ii) that the use of the data by JCI and its expert constitutes an "admission" by JCI within the meaning of Fed. R. Evid. 801(d)(2), such that the consumer statements captured within this data may be offered against JCI at trial.

Under the residual exception to the usual rule that hearsay is not admissible, a hearsay statement may be admitted if it has "equivalent circumstantial guarantees of trustworthiness" to the forms of hearsay that are admissible under Fed. R. Evid. 803 and 804, and if the court further determines that "(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than

---

[4]As Lear acknowledges, the customer surveys at issue actually encompass two levels of hearsay.  In addition to the customer statements captured in the survey data, the survey reports themselves are out-of-court statements that Lear seeks to offer for the truth of the matter asserted in the reports — *i.e.,* that they are accurate accounts of the responses given by HomeLink customers to the questions asked in the surveys.  Yet, as Lear points out, JCI has not raised any objection to the admissibility of the survey reports, except insofar as Lear seeks to rely on the underlying survey data as evidence that some customers programmed multiple buttons on their HomeLink systems.  In any event, the Court agrees with Lear that the survey reports are admissible either as business records, *see* Fed. R. Evid. 803(6), or as party admissions under Fed. R. Evid. 801(d)(2)(C) or (D).

4

any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of [the Federal Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence." Fed. R. Evid. 807. As is evident from the language of Rule 807 itself, a hearsay statement is admissible under the residual exception only if it "possesses the requisite indicia of trustworthiness," and it must also "relate to a material fact; it must be the most probative evidence reasonably available; and its admission must further the purposes of the Federal Rules of Evidence and the interests of justice." *United States v. Canan,* 48 F.3d 954, 960 (6th Cir. 1995) (internal quotation marks and citations omitted); *see also Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 231 (2d Cir. 1999) (identifying five prerequisites to the admissibility of hearsay under Rule 807). The courts have cautioned that Rule 807 should be "narrowly construe[ed]," lest it "becom[e] the exception that swallows the hearsay rule." *Akrabawi v. Carnes Co.,* 152 F.3d 688, 697 (7th Cir. 1998).

Next, Lear appeals to Fed. R. Evid. 801(d)(2), under which certain statements made or adopted by an opposing party are deemed "not hearsay" if offered against that party. As discussed in greater detail below, Lear relies primarily on a theory of "adoption by use," under which a party's use of or reliance on the hearsay statement of another may constitute an "adoption" of the statement's truth within the meaning of Fed. R. Evid. 801(d)(2)(B). *See, e.g., White Industries, Inc. v. Cessna Aircraft Co.,* 611 F. Supp. 1049, 1062 (W.D. Mo. 1985) (discussing this theory of "adoption by use"). Alternatively, Lear suggests that JCI's damages expert's use of the survey data in formulating a theory of

5

damages and preparing his expert report might qualify as an admission "by a person authorized by [JCI] to make a statement concerning the subject."  Fed. R. Evid. 801(d)(2)(C).  Under either of these approaches, it is not enough that an opposing party's admission "merely repeats" the underlying hearsay; rather, the party must actually make use of the hearsay in a manner that "manifest[s] a belief in [its] trustworthiness," or otherwise reflects the party's incorporation of the substance of the hearsay into a statement that the party itself either made or authorized.  *See Schering Corp.,* 189 F.3d at 239.

**B.    Lear Has Established JCI's "Adoption by Use" of the Survey Data.**

Although Lear's trial brief focuses first and foremost upon Rule 807's residual exception, the Court believes that this exception should be invoked only as a last resort, and that it is more appropriate to first consider whether JCI has relied on the survey data in a manner that would qualify as "adoption" of its truth under Fed. R. Evid. 801(d)(2)(B).  Under this Rule, a third party's out-of-court statement may be offered against a party if "the party has manifested an adoption or belief in its truth."  Fed. R. Evid. 801(d)(2)(B).  This can occur, for example, where a party prepares a report or takes action based upon inferences drawn from the third party's statement, *see, e.g., Schering Corp.,* 189 F.3d at 239 (party prepared report summarizing and drawing inferences from survey data that incorporated out-of-court statements of third parties); *Agricultural Insurance Co. v. Ace Hardware Corp.,* 214 F. Supp.2d 413, 416 (S.D.N.Y. 2002) (party prepared accident report that relied in part on out-of-court statements of eyewitnesses), or

6

where a party incorporates the third party's statement into its own affirmative effort to achieve a desired result or support its position, *see, e.g., Wagstaff v. Protective Apparel Corp.,* 760 F.2d 1074, 1078 (10th Cir. 1985) (party reprinted and distributed newspaper articles that made representations about the party's financial condition); *Grundberg v. Upjohn Co.,* 137 F.R.D. 365, 370 (D. Utah 1991) (party used clinical reports by non-party physicians in support of effort to secure FDA approval of new drug).  As one court has summarized:

> There is no doubt that where a party's use of a document supplied by another in fact represents the party's intended assertion of the truth of the information therein, an adoptive admission can be found.  Situations of this sort are most commonly encountered where the party forwards the document to another in response to some request (or perceived need) for information of the sort contained in the document.

*White Industries,* 611 F. Supp. at 1062 (citations omitted).

In this case, Lear points to two examples of JCI's "use" of the survey data in a manner which would, in Lear's view, qualify as manifestations of JCI's "adoption or belief" in the truth of this data.  First, Lear points to the testimony of a JCI employee, James Trainor, in which he indicated that JCI made use of the survey data as one of many factors in the company's business decisions.  Mr. Trainor further testified that the survey results were "fundamentally representative" of the opinions of those who took the survey, and he responded in the affirmative when asked whether he or other JCI representatives had "publicly adopted the opinion surveys in making representations to the public." (1/27/2011 Trial Tr. at 82, 99.)  Based on this testimony, Lear contends that JCI adopted

7

the statements of the survey respondents and vouched for the accuracy of these statements.

The problem with Lear's reliance on this testimony, however, is that Mr. Trainor never indicated that JCI made use of, relied upon, or otherwise vouched for the truth of the ***specific aspect*** of the survey data that is pertinent to Lear's claims of infringement — namely, the data showing that a percentage of HomeLink customers programmed two or more buttons on their HomeLink units. Rather, as JCI points out, Mr. Trainor testified that the survey results generally were used to gauge customer satisfaction and the demand for the HomeLink product in vehicles, as well as other marketing purposes. (*See* 1/27/2011 Trial Tr. at 98-100.) Similarly, to the extent that JCI has published some of the survey results on its website, there is no evidence that the company has highlighted, emphasized, or otherwise vouched for the portion of the survey data addressing multiple-button programming of HomeLink systems. Thus, the Court cannot say that either Mr. Trainor's testimony or JCI's display of the survey data on the internet constitutes an "adoption by use" of the pertinent aspect of this data. *See Canan,* 48 F.3d at 960 (emphasizing that the admissibility of a lengthy document must be considered "sentence by sentence").

Lear fares better, however, in appealing to JCI's use of the survey data by supplying it to JCI's damages expert, Brian Blonder. In his expert report, Mr. Blonder cites "considerable evidence" that only a "small percentage" of HomeLink consumers are using their units "in a fashion that would infringe the Roddy patent," and he states that

8

"[t]his conclusion is supported by several different JCI surveys at different points in time since 1995 that included questions related to Homelink consumer use." (Blonder 11/30/2005 Expert Report at 36.)  He then cites data from these JCI surveys indicating, for example, that between 40 and 85 percent of HomeLink units were used with garage door openers ("GDOs"), while only 9 to 13 percent of these systems were used to control security systems, lights, entry gates, or other non-GDO systems.  (*Id.*)  Finally, and most importantly for present purposes, he states that the "[s]urveys confirm that . . . multi-button use was not common, indicating that between 25 and 35% of Homelink owners did not use the Homelink product at all," and that "[o]f those Homelink owners who actually used the product, surveys showed that about half limited their use to programming only 1 button and the other half used two or more buttons."  (*Id.* at 36-37.)  Based on this survey data, Mr. Blonder opines that JCI would have entered into a hypothetical negotiation with Lear[5] with the "understand[ing]" that only a small fraction of JCI's HomeLink units "could possibly infringe the Roddy patent," thereby leading JCI to offer Lear only a modest royalty rate in this hypothetical negotiation.  (*Id.* at 37-38.)

In light of Mr. Blonder's explicit use of, and heavy reliance upon, precisely the aspect of the survey data that Lear wishes to offer — namely, the data showing the percentage of consumers who programmed more than one button on their HomeLink units — the Court finds that JCI "manifested an adoption or belief in [the] truth" of this

---

[5]Both sides' damages experts have employed this "hypothetical negotiation" rubric to arrive at estimates of Lear's damages.

data, Fed. R. Evid. 801(d)(2)(B), by supplying it to Mr. Blonder so that he could incorporate it into his damage analysis.  As noted, Mr. Blonder looked to these surveys specifically because they "included questions related to Homelink consumer use," (Blonder 11/30/2005 Expert Report at 36), and JCI has not suggested any other reason why it might have given these survey results to its damages expert.  JCI plainly contemplated that its damages expert would need to estimate the extent of potentially infringing use of its HomeLink units in order to compute Lear's damages, and it seems safe to assume that JCI provided the survey data to Mr. Blonder for precisely this purpose.  Indeed, the shared understanding of JCI and Mr. Blonder on this point is confirmed by the fact that Mr. Blonder proceeded to rely exclusively on this survey data — and, so far as his report reveals, nothing else — in determining the extent to which HomeLink units were programmed and used in a manner that could infringe the Roddy patent.  Surely, then, this evidences JCI's belief that the data were an accurate and reliable measure of consumer use and programming of their HomeLink units.

Under analogous circumstances, the courts have found a party's "adoption by use" of the statement of a third party.  In *Fox v. Taylor Diving & Salvage Co.,* 694 F.2d 1349, 1355-56 (5th Cir. 1983), for example, the court held that the plaintiff had adopted the truth of his expert's trial testimony that he was an onshore supervisory employee who was not eligible for a recovery under the federal Jones Act, 46 U.S.C. § 688.  In that case, the expert's information regarding the plaintiff's employment status had been supplied by the plaintiff's counsel, "who pressed the fact that [the plaintiff] was promoted to 'onshore'

10

work." *Fox,* 694 F.2d at 1355.  The expert, in turn, relied on this information as "a

central and explicit theme of his detailed testimony" at trial, in sharp contrast to the

expert's pretrial (and smaller) damage calculations, which "did not depend on this explicit

adoption of non-Jones Act status."  694 F.2d at 1355.  Because the plaintiff's counsel

"made no attempt to question the [expert] concerning these assumptions," the court found

that "[t]he attorney's in-court actions, notably this silent adoption of the non-Jones Act

theory, helped to bind [the plaintiff] from claiming later in his case that the Jones Act

should, indeed, apply."  694 F.2d at 1355.  Thus, the court held that the plaintiff had

vouched for his non-Jones Act status through his "silent acquiescence to the testimony of

his own witness, a witness who based his testimony on the information that [the

plaintiff's] lawyer himself had provided."  694 F.2d at 1356.[6]

     Similarly, in *Buckley v. Airshield Corp.,* 116 F. Supp.2d 658, 662-64 (D. Md.

2000), the court allowed the plaintiff's affidavits and testimony offered in a prior suit to

be introduced against the defendant as an adoptive admission.  In that case, the defendant

had called the plaintiff as an expert witness in the prior suit, and had elicited from him an

interpretation of patent language that ran counter to the construction advocated by the

defendant in the present suit.  The court noted that the defendant's counsel in the prior

suit "made no effort to disavow" the plaintiff's testimony, nor was there any indication

_____

     [6]In *Fox,* 694 F.2d at 1354-56, the court relied on this adoptive admission as a basis for
altogether precluding the plaintiff from pursuing a recovery under the Jones Act.  Here, of
course, Lear seeks only an evidentiary admission, and does not contend that the HomeLink use
reflected in the survey data should be taken as conclusively established.

"that the interpretation [offered by the plaintiff] came as a surprise." *Buckley,* 116 F.

Supp.2d at 664. In holding that this use of the plaintiff's testimony and affidavits in the

prior litigation qualified as an adoptive admission, the court cited a statement in a treatise

on evidence that "when the proponent placed the witness on the stand to prove a

particular fact and the witness so testified, the party has created an adoptive admission of

the fact that may be admitted in a later suit." 116 F. Supp.2d at 664 (quoting 2 John W.

Strong, *McCormick on Evidence* § 261 (5th ed. 1999)).

Other cases have reached a similar conclusion, albeit under circumstances where a

party itself has made a more direct and explicit use of a third party's out-of-court

statement. In *Schering Corp.,* 189 F.3d at 238-39, for instance, an employee of defendant

Pfizer wrote a report summarizing the results of a survey of physicians and drawing

conclusions about the types of messages being communicated to physicians by Pfizer

representatives. The court held that Pfizer had adopted the truth of the survey results by

drawing inferences from this underlying data, thereby "manifest[ing] a belief in the

trustworthiness of [the survey] and conced[ing] the survey's reliability." *Schering Corp.,*

189 F.3d at 239. Likewise, in *Tracinda Corp. v. DaimlerChrysler AG,* 362 F. Supp.2d

487, 500-01 (D. Del. 2005), the court held that documents provided to defendant

DaimlerChrysler by a public relations firm were admissible under Fed. R. Evid.

801(d)(2)(B), where the materials were "passed on to the DaimlerChrysler

communications department" which, in turn, produced a report that "incorporated many

of the ideas and issues" found in the documents from the outside firm. *See also Wagstaff,*

12

760 F.2d at 1078 (finding that newspaper articles were admissible under Fed. R. Evid. 801(d)(2)(B) where the defendant corporations reprinted and distributed them for the purpose of highlighting their statements about the defendants' financial situation); *Agricultural Insurance Co.,* 214 F. Supp.2d at 416 (admitting an accident report prepared by the defendant that incorporated the out-of-court accounts of eyewitnesses, where the report "drew inferences as to what in fact occurred from the statements of" these eyewitnesses); *Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.,* No. 04-754, 2006 WL 3041102, at *4-*5 (D.N.J. Oct. 26, 2006) (admitting expert affidavits submitted by one of the plaintiffs in support of a European patent application, reasoning that the plaintiff could not "use the expert affidavits to support its European patent application and then deny that it accepts the truth of the information contained therein").

More generally, in a thoughtful and comprehensive discussion of the theory of "adoption by use" of a third-party document, the court in *White Industries,* 611 F. Supp. at 1062, recognized that this theory "presents some particularly troublesome problems" in distinguishing between "the mere existence of a document in a party's files," on the one hand, and a party's "use of a document supplied by another [in a manner which] in fact represents the party's intended assertion of the truth of the information therein," on the other.  As noted earlier, the court reasoned that an adoptive admission generally may be found "where the party forwards the document to another in response to some request (or perceived need) for information of the sort contained in the document."  611 F. Supp. at 1063; *see also Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor,*

*Ltd.,* 262 F. Supp.2d 251, 259 (S.D.N.Y. 2003) ("An entity's printing, publishing and dissemination of a document or a report that contains statements that pertain in some way to the organization or company can constitute an adoptive admission.").  Even where a party's use of a third-party document is strictly internal, the court opined that the document should be admissible as an adoptive admission if it is "shown that the party acted (or failed to act) in some *significant, identifiable way, in direct reliance upon the specific information in question,* so as to demonstrate clearly the party's belief in and intentional adoption of that information."  611 F. Supp. at 1063 (emphasis in original).

Upon close review and careful consideration of this case law, the Court finds that this "adoption by use" theory of admissibility applies here.  In order to formulate an opinion on damages, JCI's expert had to determine the extent to which consumers were using JCI's HomeLink product in a potentially infringing manner.  Anticipating this need for its expert to know how its product was being used, JCI supplied its expert with survey data that addressed precisely this question.  By doing so, JCI vouched for the data as an accurate and trustworthy reflection of the matter in question — namely, how consumers were using JCI's HomeLink product.  JCI's expert then put this data to exactly this use, relying on what it shows about consumer use of HomeLink to formulate a theory of damages that JCI intends to offer at trial.[7]  If JCI views this survey data as sufficiently reliable to support its expert's assessment of damages, it is difficult to see how JCI can

---

[7]As of the date of this opinion, Mr. Blonder has not yet testified, but the Court assumes that he will do so in conformance with the substance of his expert report.

14

then turn around and object that the ***very same aspect of the very same data*** is too inaccurate and untrustworthy to support an element of Lear's case-in-chief.  Rather, having "manifested an adoption or belief in [the] truth" of this data by providing it to an expert in need of information on the very subject addressed by the data, JCI established the predicate for admissibility of this data under Fed. R. Evid. 801(d)(2)(B).

In invoking this theory of admissibility, the Court emphasizes that it is ***not*** the use of the survey data by JCI's damages expert, by itself, that gives rise to an adoptive admission under Fed. R. Evid. 801(d)(2)(B).  As JCI points out, the courts are reluctant to view an expert as an "agent" of the party who calls him as a witness, or as "authorized by the party to make a statement concerning the subject" addressed in his expert testimony, such that out-of-court statements or information incorporated into the expert's testimony would be admissible under Fed. R. Evid. 801(d)(2)(C) or (D).  *See, e.g., Kirk v. Raymark Industries, Inc.,* 61 F.3d 147, 164 (3d Cir. 1995) (noting that "despite the fact that one party retained and paid for the services of an expert witness, expert witnesses are supposed to testify impartially in the sphere of their expertise").[8]  In addition, JCI correctly observes that materials provided to an expert need not be admissible in evidence in order for an expert to rely on them in offering his opinion, *see* Fed. R. Evid. 703, and that these materials do not become admissible merely because the expert actually relies on

---

[8]The Court notes that this concern about holding a party to the testimony of an independent expert is mitigated where, as here, it is only a ***fact*** presented to and relied upon by an expert, and not the expert's opinion, that is the subject of an "adoptive admission" inquiry under Fed. R. Evid. 801(d)(2)(B).

them, *see, e.g., Gong v. Hirsch,* 913 F.2d 1269, 1273 (7th Cir. 1990). Finally, the Court gives no special significance to the fact that Mr. Blonder deemed the survey data sufficiently reliable to incorporate it into his damage analysis.

Rather, the Court's focus here — like the focus in Fed. R. Evid. 801(d)(2)(B) — is on conduct by the ***party,*** JCI, which "manifest[s] an adoption or belief in [the] truth" of a matter asserted by a third party (here, HomeLink customers). The crucial act of "adoption" in this case occurred when JCI supplied the survey data to its expert as a means for the expert to determine how JCI's HomeLink product was being used by consumers. That the expert then proceeded to use the survey data in this manner merely confirms the purpose for which JCI supplied it, and does not add to (or detract from) JCI's act of adoption. Importantly, JCI's trial brief regarding the admissibility of the survey data is utterly silent on this subject, offering no argument as to why it should not be deemed to have vouched for the trustworthiness of the survey data by giving it to Mr. Blonder.[9] Neither has the Court been able to identify a basis for relieving JCI of the evidentiary consequence of its decision to produce the survey data to its expert as an accurate reflection of consumer use of its HomeLink product. Indeed, and as observed earlier, it strikes the Court as only fair that Lear should be able to rely on the very same data regarding consumer use of HomeLink that JCI and its damages expert intend to rely

_____

[9]To be fair to JCI, however, Lear is less than explicit in its own trial brief in pursuing the precise theory of "adoption by use" that the Court has invoked in ruling the survey data admissible.

16

upon to limit the universe of potentially infringing uses of HomeLink. Accordingly, the Court concludes that the survey data at issue is admissible under Fed. R. Evid. 801(d)(2)(B), to the extent that JCI provided this data to its damages expert.[10]

---

[10]In light of this ruling, the Court need not address Lear's appeal to the residual hearsay exception set forth in Fed. R. Evid. 807. For what it is worth, the Court is doubtful that Lear could establish that the survey data is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed. R. Evid. 807. Presumably, nothing prevented Lear from directly contacting fix kit owners to determine whether they had programmed multiple buttons on their HomeLink units. While Lear notes that these individuals likely are scattered throughout the country, a simple telephone call presumably would have revealed whether follow-up efforts were warranted. Moreover, Lear had ample time to undertake these efforts, where the extent and scope of Lear's remaining claims of infringement has been clear since the Court's summary judgment ruling in November of 2007. Although the Court ruled on an additional issue of claim construction only shortly before trial, it did so in response to a motion filed by Lear in July of 2010, over six months before trial. This motion evidenced Lear's full awareness of the possibility that it might need to marshal proof of multiple-button use of HomeLink, at least in the event of an adverse ruling on its motion (which ultimately came to pass). In short, it appears that Lear's need for the survey data is a dilemma of its own making.

### III.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the consumer survey data addressed in the parties' trial briefs (at docket #s 218 and 219) is admissible under Fed. R. Evid. 801(d)(2)(B), to the extent that JCI provided this data to its damages expert, Brian Blonder.[11]


                       s/Gerald E. Rosen
                       Chief Judge, United States District Court

Dated:  February 7, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 7, 2011, by electronic and/or ordinary mail.

                       s/Ruth A. Gunther
                       Case Manager

---

[11]As noted earlier, Mr. Blonder has not yet testified at trial, and the Court reserves the right to revisit the admissibility of the survey data in the event that Mr. Blonder's trial testimony sheds additional light on the issues addressed in this opinion.